# United States Court of Appeals

## FOR THE EIGHTH CIRCUIT

_____

Nos. 95-4206 and 96-1228

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Plaintiff - Appellee, | * | |
| | * | Appeals from the United States |
| v. | * | District Court for the |
| | * | District of Minnesota. |
| Gary Lefkowitz, | * | |
| | * | |
| Defendant - Appellant. | * | |

_____

Submitted:  April 14, 1997

Filed: September 9, 1997

_____

Before RICHARD S. ARNOLD, Chief Judge, LOKEN and HANSEN, Circuit Judges.

_____

LOKEN, Circuit Judge.

Gary Lefkowitz appeals his forty-five-count conviction for mail and wire fraud, managing a continuing financial crimes enterprise, defrauding an agency of the United States, aiding in the preparation of false tax returns, making a false statement in connection with a bankruptcy case, and obstruction of justice.  He was sentenced to 293 months in prison for the continuing financial crimes enterprise violation, and to lesser concurrent terms on the other counts of conviction.  Lefkowitz argues that the

evidence was insufficient to convict him of any crime, that a judge of this court denied him due process by limiting his Criminal Justice Act award for expert services to $169,000, and that the district court[1] abused its discretion in partially denying his third motion for a continuance. In No. 96-1228, Lefkowitz appeals a post-conviction order that he reimburse the government for the costs of his defense. We reverse the convictions on one wire fraud count and one mail fraud count but otherwise affirm.

## I. Sufficiency of the Evidence.

In reviewing the sufficiency of the evidence, we view the evidence in the light most favorable to the government and uphold the verdict "if any interpretation of the evidence would allow a reasonable-minded jury to conclude guilt beyond a reasonable doubt." United States v. Hood, 51 F.3d 128, 129 (8th Cir. 1995).

### A. The Core Scheme to Defraud.

From 1984 to 1994, Lefkowitz was President of Citi-Equity Group, Inc. (CEG), a California corporation that formed real estate limited partnerships to build low- and moderate-income housing. In 1987, CEG began concentrating on projects that would qualify limited partners for low-income housing tax credits under 26 U.S.C. § 42. To qualify, investors must build, rehabilitate, or acquire buildings in which a prescribed percentage of the apartment units are occupied by low-income tenants. The federal government allocates tax credits to the States, with at least ten percent reserved for ventures in which nonprofit organizations participate. State and local housing agencies allocate the credits to specific projects.

---

[1]The HONORABLE DAVID S. DOTY, United States District Judge for the District of Minnesota.

In a typical project, CEG would find land in a desirable location, develop plans for an apartment complex, hire a builder, and apply to the appropriate housing agency for tax credits. With credits allocated to the project, CEG would form a limited partnership, with Lefkowitz and CEG as general partners, and release a Private Placement Memorandum (PPM) to securities broker-dealers who marketed the investment to prospective limited partners. Money raised from limited partners was the project's equity, generally between one-quarter and one-third of the total project cost. Upon completion of the building, CEG's management company leased out the apartments, the state housing agency released the allocated tax credits, remaining debts to the builder were paid, and limited partners began receiving their annual tax credits.

During the late 1980's, CEG's builders obtained construction loans to build the projects, while CEG obtained permanent financing to replace the construction loan once a building was completed. Beginning in 1990, with construction loans hard to obtain, CEG began marketing First Secured Mortgages (FSMs) to individual investors. FSM investors made non-recourse loans at construction loan interest rates to the limited partnerships that owned one or more designated projects, with the expectation that CEG's permanent lenders would take out the FSM loans with long-term mortgages.

Fraud on Investors. When Lefkowitz left CEG in May of 1994, properties in which limited partners and FSM investors had invested more than $80,000,000 were unbuilt, unfinished, or lost in foreclosure. The evidence demonstrates that Lefkowitz had managed CEG so as to defraud investors. Funds from limited partners and FSM investors were first deposited in an operating account for each particular investment. But Lefkowitz and CEG as general partners immediately transferred all investor funds to a central CEG account. From there, Lefkowitz personally controlled all expenditures, and CEG employees had standing instructions first to pay Lefkowitz's personal bills, then CEG's general operating expenses, and finally expenses for the various ongoing projects. From January 1990 to May 1994, $9,500,000 was used to pay Lefkowitz's personal expenses, including over $5,000,000 in deposits to Mrs.

Lefkowitz's bank account and $2,000,000 in American Express bills. CEG employees referred to the resulting shortfall -- the difference between money on hand and money needed to replace project funds spent elsewhere -- as the "black hole." In 1990, the black hole was $3,000,000 to $4,000,000. By January 1994, it had grown to $25,000,000 to $30,000,000. When CEG employees expressed concern about the growing black hole, Lefkowitz replied that he could always raise more money.

As the black hole grew, Lefkowitz increasingly relied on funds from new projects to complete old projects. IRS agents traced new partnership deposits that cleared negative balances in the central CEG account and then were used to meet Lefkowitz's personal needs and to fund older projects. This practice was not disclosed to CEG investors, as each PPM included an "Estimated Use of Proceeds" section that showed only a small portion of the funds going to CEG for general partner expenses, salaries, and fees. Lefkowitz denies that this was fraudulent, pointing to Article IX of the PPM's, which permitted CEG to lend money "on behalf of the Partnership to others, including the General Partners and their Affiliates." However, while this provision would alert investors that idle limited partnership funds might be loaned to other productive projects, it did not describe Lefkowitz's practice of repeatedly "lending" limited partners' entire investment to projects whose funds were exhausted.

There was evidence Lefkowitz intentionally concealed these internal transfers from investors. Prior to one visit from a due diligence officer representing broker-dealers, Lefkowitz asked an in-house accountant if anything in the partnership tax returns might "hurt him." The accountant replied that pages reflecting the loans from the partnerships to CEG were his biggest concern. Lefkowitz promptly ripped those pages out of the tax returns. On another occasion, CEG's securities counsel asked Lefkowitz about his wholesale borrowing of investor funds. Lefkowitz replied that it was limited to short-term loans on a few occasions when partnerships had idle funds.

Lefkowitz also misused FSM funds. FSM loan documents provided that the borrowing partnership "shall not use or permit any related person" to use the FSM loan "other than in connection with the construction and development of the Property." Numerous investor witnesses described meetings and conversations in which Lefkowitz represented that monies raised in FSM offerings were construction funds that would be used to build specific projects, secured by mortgages on those projects, and that the money would be held in escrow and drawn down as construction proceeded. Notwithstanding these representations, FSM funds were transferred to the central CEG account and spent at Lefkowitz's discretion.

CEG's real estate construction projects could not be marketed to limited partners, FSM lender/investors, and builders without commitments for permanent financing from long-term lenders. Indeed, by 1990, many housing agencies required proof of permanent financing before allocating tax credits to a proposed project. When CEG encountered difficulties in obtaining permanent financing, Lefkowitz persuaded the presidents of two lenders to provide commitment offers conditioned on CEG signing an acceptance and paying a fee within a specified period. Lefkowitz told the lenders that he would not use their letters, but he then referred to the letters in investor PPMs, sent them to housing agencies as part of CEG's applications for tax credits (in one case even providing a copy of a bogus check as evidence the commitment fee had been paid), and provided them to builders who used the letters to obtain construction loans. As a result of this deception, investors contributed money, housing agencies allocated tax credits, and builders built projects that CEG could not close.

Fraud on Builders. Because it commingled project funds, CEG sometimes failed to make progress payments to builders. When progress payments were in arrears on a project for which CEG did not disclose a lack of permanent financing, the result was devastating to the builder, who could not pay employees and subcontractors and could not undertake new projects because its capital was tied up in the CEG project. In these situations, Lefkowitz coerced builders to extend their construction loans and wait

while CEG looked for permanent financing. If a builder became impatient, Lefkowitz threatened legal action, and in some cases fabricated claims and filed suit. In one such dispute, Lefkowitz testified that CEG was unable to obtain permanent financing because the lender "found severe construction defects, code violations and shoddy workmanship," when in fact the lender's inspection revealed only minor defects that would not have prevented permanent financing. These tactics forced several builders into bankruptcy.

Fraud on Housing Agencies and the IRS. Lefkowitz's scheme included two different types of fraud on government agencies. First, CEG with Lefkowitz's personal approval represented to housing agencies that the National Development Council (NDC) was a nonprofit general partner in certain projects. In fact, NDC did not have a partnership agreement with CEG, and in many cases was unaware that CEG was using its name on tax credit applications. Based on those misrepresentations, nonprofit tax credits were allocated to CEG projects and ultimately claimed by their investors.

Second, to mollify investors when projects were late, Lefkowitz instructed CEG employees to file tax returns claiming that buildings finished late in the year had been completed and leased to tenants in January. This misrepresentation permitted CEG to wrongfully claim and distribute to investors tax credits for the entire year. There is ample evidence that Lefkowitz knew the properties were unfinished and the claimed credits unearned. He once told a CEG accountant not to worry about claiming false completion dates because CEG had lots of property and Lefkowitz could always claim he was confused. In addition, on several occasions, Lefkowitz had CEG claim tax credits for periods during which CEG was negotiating to purchase low-income housing projects built by others.

## B.  Mail and Wire Fraud.

To sustain Lefkowitz's convictions on seventeen counts of mail fraud and thirteen counts of wire fraud in violation of 18 U.S.C. §§ 1341 and 1343, the evidence must establish a scheme to defraud, use of the mails or interstate wires incident to the scheme, and intent to cause harm.  See Pereira v. United States, 347 U.S. 1, 8 (1954); United States v. Manzer, 69 F.3d 222, 226 (8th Cir. 1995); United States v. Nelson, 988 F.2d 798, 804 (8th Cir.), cert. denied, 510 U.S. 914 (1993).  As we have explained, there was abundant evidence that Lefkowitz used CEG to implement a single massive scheme to defraud investors, lenders, builders, and governments.  Thus, the issue for each of these counts is whether the government proved that a particular use of the mails or wires was "part of the execution of the fraudulent scheme."  Schmuck v. United States, 489 U.S. 705, 712 (1989).

**Counts nineteen, twenty-one, and twenty-seven** concern the Paris Place Apartments in Sauk Rapids, Minnesota.  In the fall of 1991, construction was completed, CEG took possession, and tenants moved in.  But CEG had only an illusory permanent financing commitment, so the partnership could not make a final payment to the builder.  When the builder demanded payment, CEG sued the builder alleging failure to complete environmental studies.  To support that claim, Lefkowitz persuaded the purported permanent lender to withdraw its commitment because of environmental problems and then submitted an affidavit stating that the lender refused to fund the loan and CEG had forfeited its commitment fee.  The lender testified that CEG never paid the commitment fee and never requested that a permanent loan be funded.

Count nineteen is a letter from the builder to CEG demanding payment. Count twenty-one is CEG's reply, authorized by Lefkowitz after a month's delay, directing the builder to come to Los Angeles to pick up its check. Count twenty-seven is the Lefkowitz affidavit.  All were transmitted  by wire.  Lefkowitz argues the government failed to prove he intended to harm the builder in this contract dispute.  However, the

jury may properly infer intent from circumstantial evidence. <u>See</u> <u>United States v. Berndt</u>, 86 F.3d 803, 809 (8th Cir. 1996). The evidence was sufficient to permit a reasonable jury to infer that Lefkowitz intended to harm the builder by providing an illusory permanent financing commitment and then avoiding CEG's obligations to the builder with a sham lawsuit supported by Lefkowitz's false affidavit. Each document was either a use of the wires to further the scheme to defraud or, in the case of the builder's demand for payment, a reasonably foreseeable use of the mails or wires by a third party. <u>See</u> <u>United States v. Brewer</u>, 807 F.2d 895, 898 (11th Cir.), <u>cert. denied</u>, 481 U.S. 1023 (1987). The convictions on these counts must be affirmed.

**Counts two, seven, eight, and eighteen** relate to Lefkowitz's on-going deception of investors. Count two is a Lefkowitz-approved letter from CEG to an investor in the Citi-Minnesota partnership falsely stating that construction had been delayed by severe weather in Duluth but would be completed on time. In fact, construction was never started. Counts seven and eight were identical letters from Lefkowitz to two investors in the Citi-Minneapolis IX partnership falsely stating that construction was "moving forward" and enclosing a photograph falsely described as depicting "a groundbreaking ceremony . . . on the site of the property owned by Citi-Minneapolis Partners IX." In fact, the Citi-Minneapolis IX project was never begun. Count eighteen was a wire transfer of Citi-Elmcrest rental income into CEG's main account. That income had been dedicated to the limited partners or to a reserve fund to cover unexpected maintenance costs.

Lefkowitz argues that the evidence was insufficient to convict him on these counts because the government failed to prove he embezzled investor funds. But the evidence was sufficient to prove that the three uses of the mails furthered the scheme to defraud by falsely assuring investors their projects were proceeding. <u>See</u> <u>United States v. Lane</u>, 474 U.S. 438, 451-52 (1986). The wire transfer of rental income was part of the core scheme to pool CEG project funds and use them without regard to contrary promises in the PPMs and partnership agreements.

Lefkowitz also argues that the government failed to prove use of the mails in counts seven and eight because the recipients testified that the letters arrived by mail but not "United States mail."  However, a rational jury may conclude from such testimony that the items were delivered by the United States Postal Service.  See United States v. Fox, 69 F.3d 15, 18 (5th Cir. 1995); United States v. Griffith, 17 F.3d 865, 877 (6th Cir.), cert. denied, 513 U.S. 850 (1994).

**Counts nine and twenty-nine** involve two letters concerning the extent of a permanent lender's prior dealings with CEG.  Lefkowitz used the letters to induce investors to contribute to FSM-VIII, falsely representing the information contained in the lender's letter.  He argues that the government failed to prove intent to deceive FSM-VIII investors because investors were on notice that CEG did not have solid permanent financing commitments.  However, Lefkowitz used the letters to further his overall scheme to defraud investors by obtaining FSM funds that were siphoned away from the proposed projects to pay his personal expenses and CEG's other debts.

**Counts fourteen to sixteen, twenty, and twenty-two to twenty-five** relate to FSM-VI.  The first three counts involve interest checks mailed to FSM investors at a time when FSM-VI's funds were depleted and could not be earning interest.  These checks support a conviction for mail fraud because they prevented investors from uncovering the fraud.  See Lane, 474 U.S. at 451.  The last four counts involve wire transfers of the original investor funds into FSM-VI, unquestionably an integral part of the overall scheme to defraud as these funds were moved into CEG's main account and spent on expenses unrelated to FSM-VI properties.  Lefkowitz argues that pooling investor funds and spending them at his discretion was not inconsistent with the language in the various PPMs.  We disagree, but in any event the jury could reasonably find the overall scheme fraudulent, the language of the PPMs notwithstanding.  The documents at issue in these counts clearly furthered that overall scheme.

**Counts twenty-six and twenty-eight** concern Lefkowitz-approved letters that CEG faxed to one of its broker-dealers. One letter falsely stated that CEG was holding FSM-IV funds in escrow and releasing them to contractors as work was completed, when in fact CEG had already spent most of those funds on unrelated properties and was paying FSM-IV contractors from its main account. The other letter falsely stated that CEG had almost $1,500,000 of FSM-VI funds in a construction fund for the Aspen III apartment building; in fact, most FSM-VI funds had been funneled into CEG's main account and spent elsewhere. Lefkowitz argues this evidence does not prove intent to harm investors because the FSM-IV properties were built and he always intended to build Aspen III. But both letters concealed CEG's use of investor funds so that the broker-dealer would continue encouraging clients to invest in its projects. Intent to harm may be inferred from this type of active concealment. See United States v. Stouffer, 986 F.2d 916, 923 (5th Cir.), cert. denied, 510 U.S. 837 (1993).

**Count thirty** concerns a telephone conversation in early February 1993 between Lefkowitz and a Minnesota broker-dealer concerning whether the FSM-VI funds were still in escrow and available for construction. Lefkowitz concedes that he lied about that but argues that the government presented no evidence that this was an interstate telephone conversation. The government responds, "There was no evidence that Lefkowitz, a California businessman, was in Minnesota at the time." Given the government's burden of proof, that response is totally inadequate.

Testifying for the government at trial, the broker-dealer related the substance of the conversation but not whether it was an interstate call. Lefkowitz testified at length for the defense but was not asked about this conversation. A jury may reasonably infer from circumstantial evidence that a telephone call was between the parties in different States. See United States v. Galbraith, 20 F.3d 1054, 1056-57 (10th Cir.), cert. denied, 513 U.S. 889 (1994); United States v. Griffith, 17 F.3d 865, 874 (6th Cir.), cert. denied, 513 U.S. 850 (1994). But our review of the massive record on appeal has uncovered no circumstantial evidence from which the jury could infer that Lefkowitz,

who made many trips to Minnesota, was elsewhere at the time of this call. Lacking help from the government on this issue, we agree with Lefkowitz that the evidence is insufficient to prove the interstate element of federal wire fraud. His conviction on count thirty must be reversed.

**Counts three, four, and seventeen** relate to tax credit applications. Two counts involve letters advising CEG that the Minnesota Housing Finance Agency (MHFA) had reserved nonprofit tax credits for projects after CEG falsely listed NDC as a fifty-percent general partner. Lefkowitz argues the evidence was insufficient to prove he knew of this misrepresentation. However, a CEG employee testified that Lefkowitz instructed him to claim NDC as a fifty-percent partner and specifically approved the fraudulent applications. The third count involves a fraudulent permanent financing commitment letter that CEG faxed to MHFA to satisfy its requirements for tax credits. Lefkowitz argues that no non-profit tax credit application was submitted for this project so the fax did not further an alleged scheme to defraud. However, for-profit tax credits were allocated to the project and claimed by CEG investors before the building was completed. Therefore, the fax was an integral step in the overall scheme to defraud government of low-income housing tax credits.[2]

**Counts five, six, and ten to thirteen** are IRS tax forms CEG mailed to investors advising they were entitled to claim low-income housing tax credits in a particular year. Five advised of non-profit tax credits for projects on which CEG had falsely claimed NDC as a partner. Lefkowitz argues he reasonably relied on his accountants to

---

[2]**Counts forty-two and forty-three** charged Lefkowitz with violating 18 U.S.C. § 1001 (1990) by knowingly and willfully using false documents in a matter within the jurisdiction of an agency of the United States (the IRS) when he caused CEG to file false non-profit tax credit applications with MHFA. Though Lefkowitz claims that he did not know the applications would list NDC as a project partner, there was ample evidence permitting a reasonable jury to find knowing and willful violations of § 1001. See United States v. Yeriman, 468 U.S. 63, 69 (1984).

-11-

determine what credits investors could legitimately claim. However, Lefkowitz caused the filing of false tax credit applications. Advising investors to claim the resulting undeserved credits was a foreseeable and necessary step in this part of the overall scheme to defraud. The sixth tax form advised an investor to claim credits for all of 1990 on a project that CEG did not purchase until December 31, 1990. Lefkowitz argues insufficient proof of intent to defraud because CEG might have assumed the benefits and burdens of ownership, and thus became entitled to the credits, before signing the purchase agreement. However, the real estate broker testified that he did not introduce Lefkowitz to the seller until late December, sufficient evidence that the claim of tax credits for the entire year was part of the overall scheme to defraud.

**Count one** involves a letter from Lefkowitz to a broker-dealer enclosing Lefkowitz's written response to a due diligence organization's inquiry as to why he had not disclosed his suspension from the practice of law in California. Broker-dealers were concerned that the suspension should be disclosed to CEG investors. Lefkowitz's explanation was a dishonest summary of the conduct that caused the suspension and the California Supreme Court's opinion in the matter. At trial, Lefkowitz objected in chambers to any evidence of the California suspension as irrelevant and unfairly prejudicial. The government proposed to limit its evidence to a certified copy of the California Supreme Court opinion plus Lefkowitz's response to the broker-dealer inquiry, introduced with minimal foundation from a broker-dealer recipient. The district court ruled that the documents would be admitted on that basis. When trial resumed, the witness testified that she received the letter and its enclosure but was not asked on direct or cross exam if they were received by United States mail. On appeal, Lefkowitz argues that the government failed to prove that this letter was sent by United States mail.[3] We agree that under the governing mail fraud statute (§ 1341 has since

---

[3]As to fifteen of the mail fraud counts, Lefkowitz generally argues that the government failed to prove use of the mails, and the government responds that there was testimony "for each mailing" but only provides three citations to the trial record. When the record is as massive as in this case, we expect defense counsel who raise an issue of this kind to cite the testimony and exhibits establishing each failure of proof, and government counsel to respond with equal specificity. When both sides fail in this regard, appellant cannot complain if we affirm. However, in this case we have combed the record and found sufficient evidence as to use of the mails for all mail fraud counts with the exception of count one.

been amended to include delivery "by any private or commercial interstate carrier"), the government's proof as to use of the mails was insufficient. See United States v. Hannigan, 27 F.3d 890, 895 (3d Cir. 1994); United States v. Cady, 567 F.2d 771, 775 (8th Cir. 1977). Accordingly, Lefkowitz's conviction on count one must be reversed.

### C. Continuing Financial Crimes Enterprise (Count Forty-Seven).

The manager of a continuing financial crimes enterprise (CFCE) violates 18 U.S.C. § 225 if (i) he supervises a series of mail or wire fraud transactions which affect a financial institution, (ii) receives at least $5,000,000 in gross receipts from the criminal enterprise in a twenty-four-month period, and (iii) acts in concert with at least three other persons in executing the crimes.[4] The jury found that Lefkowitz violated

---

[4]Section 225 provides:

(a) Whoever (1) organizes, manages, or supervises a continuing financial crimes enterprise; and (2) receives $5,000,000 or more in gross receipts from such enterprise during any 24-month period, shall be fined not more than $10,000,000 if an individual, or $20,000,000 if an organization, and imprisoned for a term of not less than 10 years and which may be life.

(b) For purposes of subsection (a), the term "continuing financial crimes enterprise" means a series of violations under section 215, 656, 657, 1005, 1006, 1007, 1014, 1032, or 1344 of this title, or section 1341 or 1343 affecting a financial institution, committed by at least 4 persons acting in concert.

-13-

§ 225 when CEG raised more than $5,000,000 from FSM-VI and FSM-VIII investors within a two-year period, because banks invested in those offerings and at least three other persons acted in concert with Lefkowitz in executing mail and wire frauds.

The evidence is clear that banks invested a total of $1,120,000 in FSM-VI and FSM-VIII. Those offerings together grossed over $5,000,000. Given CEG's practice of making all invested funds available to Lefkowitz personally, it is clear he received at least $5,000,000 from this part of the CEG enterprise in a two-year period. Lefkowitz suggests that banks investing in FSM-VIII were not "affected" by the fraud because Lefkowitz used funds from later projects to repay FSM-VIII investors. However, whatever the banks finally realized on their investments, they were affected when deceived into investing funds that CEG then fraudulently misused.

Lefkowitz primarily argues that the government failed to prove he acted "in concert" with at least three other persons in defrauding financial institutions. "[T]he plain meaning of the phrase 'in concert' signifies mutual agreement in a common plan or enterprise." United States v. Rutledge, 116 S. Ct. 1241, 1247 (1996). While acknowledging that numerous CEG employees acted in concert with him in executing the overall scheme to defraud, Lefkowitz argues that there was no knowing complicity by his subordinates in the continuing FSM fraud against financial institutions. The jury was carefully and properly instructed on this issue:

> In order to sustain its burden of proof for the crime of managing a continuing financial crimes enterprise as charged in Count Forty Seven of the indictment, the government must prove the following:
>
> One. The defendant committed three or more violations of the mail fraud and/or the wire fraud statutes affecting financial institutions;

* * * * *

-14-

Four.  The defendant organized managed or supervised these three or more other persons *in connection with this series of violations* . . . .

(Emphasis added.)  We conclude that the evidence is sufficient to support the jury's finding that Lefkowitz violated 18 U.S.C. § 225.

### D.  False Tax Returns (Counts Thirty-Two To Forty-One).

Four of these counts concern low-income housing tax credits CEG claimed for a project not yet completed.  The other six relate to credits based upon false placed-in-service dates.  To sustain a conviction under 26 U.S.C. § 7206(2), the evidence must show that defendant willfully caused the preparation of a materially false tax return.  Lefkowitz first argues that the government failed to prove willfullness because he only mistakenly supplied incorrect information to his accountants.  However, the trial testimony of the various CEG accountants provided ample evidence that Lefkowitz (i) instructed a CEG accountant to claim credits on a project he knew was incomplete, and (ii) willfully provided false placed-in-service dates to his accountants.  That is sufficient proof of willfulness.  See United States v. Kouba, 822 F.2d 768, 773 (8th Cir. 1987).

Lefkowitz also argues that false placed-in-service dates will not sustain these convictions because low-income housing tax credits also require proof that a building is a "qualified low-income building."  26 U.S.C. § 42(f)(1).  Lefkowitz told his accountants that the projects were pre-leased to qualified low-income tenants, so that CEG could begin taking tax credits when the apartments were placed in service. Thus, Lefkowitz knew when he provided false placed-in-service dates that his accountants would wrongfully claim tax credits based on that information.  That is sufficient to sustain the § 7206(2) convictions.

### E. False Statement in a Bankruptcy Case (Count Forty-Six).

CEG was forced into Chapter 11 bankruptcy shortly after Lefkowitz left the company in May 1994. Some weeks later, after Lefkowitz attempted to sell a mortgage owned by a company he controlled but purchased with CEG investor funds, CEG filed in its bankruptcy case an affidavit by a real estate broker stating:

> On approximately June 13, 1994, I received a telephone call from Mr. Lefkowitz. During that phone call Mr. Lefkowitz asked me if I would be interested in acting as a broker to sell a mortgage which he holds on an apartment complex. I indicated to Mr. Lefkowitz that until the City Equity Group problems were resolved I would be unable to assist in this regard. Once I indicated that I was unable to assist him the phone call terminated rather abruptly.

Lefkowitz responded with an affidavit stating: "The conversation . . . never occurred." Based on Lefkowitz's affidavit, the jury convicted him of "knowingly and fraudulently mak[ing] a false declaration, certificate, verification, or statement under penalty of perjury . . . in or in relation to any case under title 11." 18 U.S.C. §152(3).

Lefkowitz argues that this conviction must be overturned because his statement was literally true. See Bronston v. United States, 409 U.S. 352, 362 (1973). The broker's affidavit, Lefkowitz explains, gave the impression that Lefkowitz was attempting to sell his own mortgage, rather than one owned by a company he controlled. His affidavit simply denied that the conversation *as described* had occurred. However, Lefkowitz's affidavit, read literally, asserts that the conversation never occurred, not that it occurred but differently than the broker described it. Moreover, his affidavit "must be considered in the context in which [it was] given." United States v. Robbins, 997 F.2d 390, 395 (8th Cir.), cert. denied, 510 U.S. 948 (1993). The jury could reasonably find that Lefkowitz lied to the bankruptcy court to cover up his effort to profit from the prior embezzlement of CEG property.

### F. Obstruction of Justice (Count Forty-Four).

In early 1993, Lefkowitz received a letter informing him that he was the target of a grand jury investigation. In October, he instructed a CEG employee to remove all documents relating to two projects from CEG's offices. The employee gathered two boxes of documents and took them to her home. When a government document subpoena in December included one of the projects, the employee did not produce responsive documents at her home with CEG's response. She finally produced the documents in early 1994 after receiving a target letter and discussing the matter with her own attorney. Based on this incident, Lefkowitz was convicted of violating 18 U.S.C. § 1503 by corruptly obstructing the grand jury's investigation.

Lefkowitz argues that this conviction must be reversed because the government did not prove a sufficient nexus between his instruction to remove documents and an intent to impede the grand jury process. We disagree. Lefkowitz knew of the grand jury investigation when he instructed the employee to remove the documents. Based upon her testimony, the jury could reasonably infer that Lefkowitz had intended her to hide these documents from the government. He knew that CEG had raised money and claimed tax credits for those two projects when the partnerships did not own any property. Thus, whether the removed documents were in fact incriminating is irrelevant because the jury could reasonably find that Lefkowitz believed they would incriminate. Section 1503 is violated by "endeavors" to obstruct justice, which include "where the defendant acts with an intent to obstruct justice, and in a manner that is likely to obstruct justice, but is foiled in some way." United States v. Aguilar, 115 S. Ct. 2357, 2363 (1995).

### II. Limiting Funding for Defense Experts.

Lefkowitz asserts that he was denied due process when a judge of this court limited him to $169,000 in accountant expert fees under the Criminal Justice Act

(CJA), 18 U.S.C. § 3006A(e).[5]  Due process requires that the government provide "the basic tools of an adequate defense."  <u>Little v. Armontrout</u>, 835 F.2d 1240, 1243 (8th Cir. 1987) (en banc) (quotation omitted), <u>cert. denied</u>, 487 U.S. 1210 (1988).  As we discuss in Part IV, there is good reason to infer that Lefkowitz was not a financially unable defendant entitled to any CJA funding.  But in any event, we are satisfied that the funds he received gave him the basic accounting tools for an adequate defense.  He retained the services of a nationally recognized accounting expert who testified extensively at trial.  We find nothing in the record suggesting that this limitation on CJA fees resulted in an unfair trial.

### III.  The Third Continuance.

On May 1, 1995, after twice continuing the trial originally scheduled for August 1994, the district court granted Lefkowitz a continuance of three weeks, rather than the three months he requested.  Lefkowitz argues that the court erred in not granting a three-month continuance because his case was especially complex, the records were voluminous, and the denial of additional expert funding was an unforeseen hardship.  "We will not overturn a trial court's denial of a continuance unless the trial court clearly has abused its discretion, because continuances are not favored and should be granted only when a compelling reason has been shown."  <u>United States v. Young</u>, 943 F.2d 24, 25 (8th Cir. 1991) (quotation omitted), <u>cert. denied</u>, 503 U.S. 964 (1992).  There was no abuse of discretion in this case.  The district court specifically considered the case's complexity and its "unique circumstances" in granting the final three-week continuance.

---

[5]The CJA provides a mechanism whereby "financially unable" defendants may obtain expert services "necessary for adequate representation."  18 U.S.C. § 3006A(e)(1).  Fees in excess of $1,000 must be certified by the district court and approved by an active circuit judge "as necessary to provide fair compensation for services of an unusual character or duration."  § 3006A(e)(3).  In this case, the reviewing circuit judge reduced the amount approved by the district court.

## IV.  The Recoupment Order.

Following his initial indictment, Lefkowitz requested appointed counsel under the CJA.  See 18 U.S.C. § 3006A(a).  A hearing was held at which Lefkowitz represented that he had no assets or income because his wife owned their residences, cars, jewelry, and art work.  The court ordered Lefkowitz to submit, *in camera,* current financial statements for himself and his wife.  After some delay, he submitted a financial statement showing a personal net worth of $18,600,000 on December 31, 1990.  The court then concluded he was able to pay his costs of defense and conditioned appointment of counsel on Lefkowitz or his wife depositing $250,000 with the Clerk of Court to cover those costs.  When Lefkowitz reneged on his promise to deposit such assets, the court discharged appointed counsel.  Lefkowitz challenged this ruling, falsely representing that the court overseeing CEG's bankruptcy had enjoined him from depositing assets for his defense.  Concerned that Lefkowitz be effectively represented in the criminal case despite his intransigence, the district court reappointed counsel, but reaffirmed that Lefkowitz was responsible for his costs of defense and ordered the Federal Defender to pursue collection if he did not comply with the court's order.  Lefkowitz never deposited any funds with the court.

After conviction and prior to sentencing, the district court held a hearing to determine whether Lefkowitz should be ordered to pay his costs of defense.  The government presented evidence that he had spent several hundred thousand dollars on personal expenses and unrelated attorney's fees between June 1994 and February 1995, contrary to his repeated claims of indigence.  Lefkowitz admitted the expenditures but claimed that he had no significant current assets and had been living off family loans for several months prior to his July 1995 incarceration.  Unpersuaded, the district court concluded that Lefkowitz has funds available and ordered him to reimburse the government $316,693.70 for his costs of defense.  Such an order is expressly authorized by 18 U.S.C. § 3006A(f).

On appeal, Lefkowitz argues that the court's finding that he currently has funds available is clearly erroneous. We disagree. A defendant has the burden of demonstrating that he is unable to afford counsel, especially when a pretrial hearing casts doubt on his need for public assistance. See, e.g., United States v. Anderson, 567 F.2d 839, 840 (8th Cir. 1977); United States v. Harris, 707 F.2d 653, 661 (2nd Cir.), cert. denied, 464 U.S. 997 (1983). Because Lefkowitz never met that burden, every pretrial order appointing counsel specified that he would ultimately bear the cost of his own defense. After the trial, Lefkowitz was given an opportunity to demonstrate that he is presently unable to reimburse the government for his defense. He presented nothing more than his personal testimony. The district court found that testimony to be entirely lacking in credibility, as do we. Our earlier orders granting him leave to prosecute these appeals *in forma pauperis* are not to the contrary.

## V. Conclusion.

Lefkowitz's convictions on count one and count thirty are reversed, and the case is remanded for entry of an amended judgment and for consideration of whether resentencing is necessary. The judgment appealed in No. 95-4206 is in all other respects affirmed. The order appealed in No. 96-1228 is affirmed. The concerns which led us to file portions of the record in No. 96-1228 under seal appear to be no longer applicable. Therefore, unless Lefkowitz files a motion objecting to this action within the time allowed for a petition for rehearing, the Clerk is directed to make the entire record in No. 96-1228 a public record.

A true copy.

Attest:

CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT.

-20-