**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,
        *Plaintiff-Appellee,*

v.

PHOTOGRAMMETRIC DATA SERVICES,
INCORPORATED,
        *Defendant-Appellant.*

No. 00-4498

UNITED STATES OF AMERICA,
        *Plaintiff-Appellee,*

v.

DAVID G. WEBB,
        *Defendant-Appellant.*

No. 00-4499

Appeals from the United States District Court
for the Eastern District of Virginia, at Alexandria.
Leonie M. Brinkema, District Judge.
(CR-99-471)

Argued: March 2, 2001

Decided: July 30, 2001

Before WILKINS, WILLIAMS, and TRAXLER, Circuit Judges.

_____

Affirmed by published opinion. Judge Traxler wrote the majority opinion, in which Judge Wilkins joined. Judge Williams wrote an opinion concurring in part and concurring in the judgment.

_____

## COUNSEL

**ARGUED:** Laurin Howard Mills, NIXON PEABODY, L.L.P., Washington, D.C., for Appellants. Jack I. Hanly, Assistant United States Attorney, Alexandria, Virginia, for Appellee. **ON BRIEF:** Laura Ariane Miller, NIXON PEABODY, L.L.P., Washington, D.C., for Appellant Webb; David F. Geneson, Lara S. Zick, HUNTON & WILLIAMS, Washington, D.C., for Appellant Photogrammetric. Helen F. Fahey, United States Attorney, Alexandria, Virginia, for Appellee.

---

## OPINION

TRAXLER, Circuit Judge:

Photogrammetric Data Services, Inc. ("PDS") and David G. Webb ("Webb") appeal their convictions and sentences for highway project fraud, *see* 18 U.S.C.A. § 1020 (West 2000), and mail fraud, *see* 18 U.S.C.A. § 1341 (West 2000). We affirm.

### I. *Facts*

Appellant PDS is a Virginia corporation engaged in the business of preparing topographic maps from aerial photography and ground surveys. Between 1994 and 1999, PDS performed subcontracting work for firms having contracts with the Virginia Department of Transportation ("VDOT") to perform preliminary engineering work for highway construction. Appellant Webb was employed by PDS as the photogrammetric manager during this time period. In December 1999, the United States filed an indictment against PDS and Webb charging highway project fraud, in violation of 18 U.S.C.A. § 1020, and mail fraud, in violation of 18 U.S.C.A. § 1341. The charges stemmed from allegations that PDS and Webb had engaged in a broad, long-term practice of submitting inflated invoices to VDOT's prime contractors, who in turn passed the invoices on to VDOT for payment.

According to the evidence, VDOT set initial limits on the amount of money that its contractors could bill for a particular job awarded,

based upon estimates of hours submitted in advance by the contractors. The contractors were then paid according to the actual number of hours worked, up to the preapproved limit, after which additional approval was required. At PDS, employees and managers completed time sheets showing the amount of hours worked on each particular job, which were then used to prepare the PDS invoices for the VDOT jobs. The actual hours worked by PDS employees, however, would often fall short of the number of hours pre-approved by VDOT and, if billed correctly, would have resulted in PDS leaving "money on the table." Consequently Webb's predecessor and Webb, who were responsible for the PDS billings on the VDOT jobs, manipulated the employee timesheets and the amount of hours allotted to PDS managers in order to ensure that PDS billed close to the dollar limits pre-approved by VDOT.

In late 1997, an employee of PDS approached law enforcement officers with information concerning PDS's long-standing practice of inflating the VDOT invoices. With the assistance of this employee acting as a government informant, including his recording of incriminating statements made by Webb at the workplace, FBI and state law enforcement agents began investigating the alleged billing fraud and eventually procured a warrant to search the PDS offices for documentation of the fraudulent scheme.

On the morning of January 20, 1999, agents executed the search warrant at the offices of PDS. At the beginning of the search PDS employees were directed to a conference room, away from the areas to be searched and, while the search was being conducted, some of these employees were interviewed by other agents. That same morning, two agents traveled to Webb's home, arriving before he left for work, to interview him concerning the allegations of fraudulent billing practices. During the interview, Webb made several admissions, including an admission that PDS had been "padding" the hours on the VDOT jobs for five years, a responsibility that he had assumed from the prior VDOT manager four years previously. By Webb's estimation, PDS had increased the billed amounts on almost every VDOT job by approximately ten to fifteen percent, resulting in overbilling of approximately $100,000 to $200,000 per year for five years. Ultimately, documents seized during the search at PDS, as well as the statements made by Webb to the agents that day, were introduced at

trial. However, no statements made by the other PDS employees at the time of the search at PDS were introduced as evidence.

At the conclusion of the trial, PDS and Webb were convicted by a jury of two counts of highway project fraud and three counts of mail fraud. Webb was sentenced to 24 months in prison and two years of supervised release, and was ordered to make restitution jointly with PDS in the amount of $435,038.33. In addition to the order to make joint restitution with Webb, PDS was placed on one year of probation and fined $522,045.29. *See United States v. Photogrammetric Data Servs., Inc.*, 103 F. Supp. 2d 875 (E.D. Va. 2000). This appeal followed.

## II.   *Motions to Suppress*

We begin with Appellants' assertion that the district court erred in denying their motion to suppress all fruits of the January 20, 1999 search at PDS, including various timesheets and handwritten notes seized at that time, and in denying their motion to suppress the statements obtained from Appellant Webb during the interview at his home that same day. In reviewing the district court's denial of a motion to suppress evidence, we review the district court's factual findings for clear error, and its legal conclusions de novo. *See United States v. Rusher*, 966 F.2d 868, 873 (4th Cir. 1992).

## A.

Appellants contend that the district court erred in (1) failing to conduct an evidentiary hearing on the issue of whether the FBI agent procuring the warrant to search the PDS offices made material omissions or misrepresentations to the magistrate judge in his affidavit to obtain the search warrant, (2) failing to exclude all fruits of the search because the law enforcement agents exceeded the permissible scope of the search warrant by detaining and interviewing PDS employees during the search, and (3) denying their motion to suppress without conducting an evidentiary hearing on the issue of whether the law enforcement agents exceeded the scope of the warrant by their actions. We address these claims in turn.

1.

In a detailed affidavit filed five days before the search at PDS, the investigating FBI agent outlined the suspected fraudulent scheme by PDS, the information obtained from the cooperating PDS employee concerning PDS's long-standing practice of overbilling VDOT contractors, the corroborating evidence that had been located by the FBI at VDOT, and the corroborating information obtained from the recorded conversations between the PDS employee-informant and Webb. The magistrate judge determined that there was probable cause to conduct the requested search at PDS and issued the search warrant.

Appellants now assert that the affidavit was faulty because it failed to inform the magistrate judge that the government had issued a grand jury subpoena to PDS for many of the same materials on the same day, that the government intended instead to use the search warrant as subterfuge to obtain statements from PDS employees in addition to the requested documents, and that the government's cooperating employee witness had stolen documents from PDS, all of which would allegedly have called into question the credibility of the government and its inside witness.

An affidavit supporting an application for a search warrant is entitled to a strong presumption of validity. *See Franks v. Delaware*, 438 U.S. 154, 171 (1978). Consequently, in order to obtain an evidentiary hearing on the integrity of an affidavit, a defendant must make "a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit." *Id.* at 155-56. The "showing 'must be more than conclusory' and must be accompanied by a detailed offer of proof." *United States v. Colkley*, 899 F.2d 297, 300 (4th Cir. 1990) (quoting *Franks*, 438 U.S. at 171)). "Mere negligence in recording the facts relevant to a probable-cause determination is not enough." *Id.* at 301 (internal quotation marks and alterations omitted).

"[T]he false information must [also] be essential to the probable cause determination: 'if, when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of prob-

able cause, no hearing is required.'" *Id.* at 300 (quoting *Franks*, 438 U.S. at 171-72). Thus, a *Franks* hearing "serves to prevent the admission of evidence obtained pursuant to warrants that were issued only because the issuing magistrate was misled into believing that there existed probable cause." *United States v. Friedemann*, 210 F.3d 227, 229 (4th Cir.), *cert. denied*, 121 S. Ct. 180 (2000).

We are satisfied that the district court did not err in refusing to conduct a *Franks* hearing. Appellants failed to make a substantial preliminary showing that the FBI agent procuring the PDS search warrant made any false statements knowingly and intentionally, or with reckless disregard for the truth, in the warrant affidavit. Nor do the alleged omissions of which Appellants complain alter the probable cause determination such that the warrant was issued by the magistrate judge because he was misled into believing that probable cause existed. First, the fact that a grand jury subpoena existed and that the FBI intended to interview PDS employees at the time of the search obviously had no effect upon whether probable cause existed to search the PDS offices for documents which were properly included within the warrant's scope. Second, the alleged "stolen" documents appear to consist of one document which the informant had reviewed during the normal course of his employment, but which he actually took from Appellant Webb's locked desk drawer. When provided to the FBI, the document was locked away and never used. Appellants have made no claim that the documents relied upon in the warrant affidavit were "stolen" or otherwise improperly obtained and no showing that the document taken by the informant from the locked desk drawer was ever relied upon by the government in any way. And, Appellants have not demonstrated that this isolated act on the part of the informant somehow operated to defeat the sufficiency of the probable cause showing otherwise made or that it so seriously undermined his credibility as to render the balance of the substantial probable cause showing unreliable.

Accordingly, we conclude that the district court did not err in refusing to hold a *Franks* hearing and in refusing to grant the motion to suppress the evidence obtained as a consequence of the warrant executed at PDS.

## 2.

Appellants next claim that the court should have suppressed all fruits of the search at PDS because, by detaining and interviewing PDS employees, the agents acted in "flagrant disregard" of the scope of the search warrant, which authorized only the seizure of certain documentary and computer records, rendering the otherwise legal search violative of Appellants' Fourth Amendment rights. *See United States v. Ruhe*, 191 F.3d 376, 383 (4th Cir. 1999). We conclude that the agents did not exceed the scope of the warrant by detaining and interviewing the PDS employees and, in any event, that blanket suppression of all documentary evidence seized in accordance with the warrant would not be required by the Fourth Amendment.

As an initial premise, we find unpersuasive Appellant's argument that the agents unlawfully "seized" the PDS employees at the time of the search. Because they were in possession of a valid warrant to search the premises of PDS for evidence of the fraudulent billing scheme, the agents at PDS necessarily had authority to secure the premises and detain the employees temporarily in order to conduct the search with minimal interference. *Cf. Michigan v. Summers*, 452 U.S. 692, 702-03 (1981) (noting that law enforcement officers searching premises for contraband pursuant to a valid search warrant have the authority to temporarily detain the occupants at the premises while the search is being conducted); *United States v. Smith*, 704 F.2d 723, 725 (4th Cir. 1983) (same). In particular, the agents at PDS, suspecting a widespread fraudulent billing practice within the company, had a valid interest in assuring that the altered timesheets they expected to find could be seized before any employee or manager had the opportunity to destroy them. *Cf. Michigan*, 452 U.S. at 702-03 (noting law enforcement's interest in detaining occupants in order to prevent "frantic efforts to conceal or destroy evidence" which could pose a risk of harm to both the police and the occupants).

Even were we to conclude that the employees were improperly detained and interviewed during the search, however, Appellants have not made a showing that their Fourth Amendment rights were violated by the agents' actions in doing so. As a general rule, items properly seized by agents executing a search warrant "may still be admitted even when they are obtained at the same time as improperly seized

items." *Ruhe*, 191 F.3d at 383; *see also United States v. Squillacote*, 221 F.3d 542, 556 (4th Cir. 2000), *cert. denied*, 121 S. Ct. 1601 (2001). Thus, "[w]hile all evidence which is not identified within a search warrant may be excluded if the executing officer exceeds the scope of the warrant, such exclusion does not extend to evidence actually named in the search warrant which is discovered during the course of the search." *United States v. Jones*, 31 F.3d 1304, 1314 (4th Cir. 1994). Properly seized evidence will be excluded only "[i]n extreme circumstances . . . when the officers executing the warrant exhibit a 'flagrant disregard for its terms.'" *Ruhe*, 191 F.3d at 383 (quoting *Jones*, 31 F.3d at 1314). "The extraordinary remedy of blanket suppression of all evidence seized should be used only when the violations of the warrant's requirements are so extreme that the search is essentially transformed into an impermissible general search," *Squillacote*, 221 F.3d at 556 (internal quotation marks omitted), such as when officers have seized "large quantities of evidence clearly not within the scope of the warrant," *id.*

In this case, of course, Appellants contend that the district court erred in admitting the properly seized documents obtained at PDS pursuant to the valid search warrant because the agents also interviewed employees while the search was being conducted. However, there is no allegation that the agents ever exceeded the scope of the search warrant in the seizure of the documents, and no statements obtained from the employees were admitted as evidence during the trial. Nor is there even an assertion that any documents ultimately obtained or admitted into evidence were only able to be procured as a result of statements made by the employees that day. Under the circumstances, we do not view the agents' interviewing of employees who had been detained during the execution of a search warrant as acts taken in "flagrant disregard" of the terms of the search warrant. Therefore, the extreme remedy of blanket suppression of the documentary evidence covered by the terms of the warrant was not required and the district court properly denied Appellants' motion to suppress on this basis.

3.

For similar reasons, we reject Appellants' alternative contention that the district court should have held an evidentiary hearing on the

motion to suppress because there was a factual dispute as to whether the employees were forcibly detained and coercively questioned. *Cf. United States v. Taylor*, 13 F.3d 786, 789 (4th Cir. 1994) (holding that "[w]hen material facts that affect the resolution of a motion to suppress evidence seized during a warrantless search are in conflict, the appropriate way to resolve the conflict is by holding an evidentiary hearing after which the district court will be in a position to make findings"). Appellants assert that they created a material factual dispute through the affidavits of several of the PDS employees who were interviewed during the search. However, while there does appear to be some discrepancy in the extent of the detention and questioning employed by the agents, as well as in the perceptions of the employees concerning their rights at the time, we cannot say that the district court erred in failing to conduct an evidentiary hearing. Even if we were to accept the version of events as set forth in the employee affidavits, Appellants were not entitled to suppression of the timesheets and other documents obtained in the search at PDS. Appellants offered no support for their conclusory claim that the search warrant was "mere subterfuge" to detain and interrogate the employees. And, as noted previously, the documentary evidence obtained and sought to be admitted was unquestionably within the scope of the search warrant, whereas the statements taken from the employees were not admitted into evidence.

### B.

Webb next contends that the statements in which he admitted padding the invoices submitted to the prime contractors, given to law enforcement agents during the January 20, 1999 interview at his home, should have been suppressed because they were made during a custodial interrogation without his having been advised of his right not to incriminate himself. We disagree.

It is, of course, well established that persons who are "'taken into custody or otherwise deprived of [their] freedom of action in any significant way'" must be given *Miranda* warnings before being questioned. *Stansbury v. California*, 511 U.S. 318, 322 (1994) (per curiam) (quoting *Miranda v. Arizona*, 384 U.S. 436, 444 (1966)). In *Miranda*, the Supreme Court afforded protection to the Fifth Amendment privilege against compelled self-incrimination "from the coer-

cive pressures that can be brought to bear upon a suspect in the context of custodial interrogation." *Berkemer v. McCarty*, 468 U.S. 420, 428 (1984). To determine whether a statement is voluntary, we look to see "whether the confession was extracted by any sort of threats or violence, or obtained by any direct or implied promises, however slight, or by the exertion of improper influence." *Hutto v. Ross*, 429 U.S. 28, 30 (1976) (per curiam) (internal quotation marks and alterations omitted). "[C]oercive police activity is a necessary predicate to the finding that a confession is not voluntary." *United States v. Braxton*, 112 F.3d 777, 780 (4th Cir. 1997) (internal quotation marks omitted). However, "[t]he mere existence of threats, violence, implied promises, improper influence, or other coercive police activity . . . does not automatically render a confession involuntary. The proper inquiry is whether the defendant's will has been overborne or his capacity for self-determination critically impaired." *Id.* at 780 (internal quotation marks omitted). "[C]ourts must consider the totality of the circumstances, including the characteristics of the defendant, the setting of the interview, and the details of the interrogation." *Id.* at 781 (internal quotation marks omitted); *see also United States v. Howard*, 115 F.3d 1151, 1154 (4th Cir. 1997) ("An individual is 'in custody' for *Miranda* purposes when, under the totality of the circumstances, the 'suspect's freedom of action is curtailed to a degree associated with formal arrest.'" (quoting *Berkemer*, 468 U.S. at 440)). When reviewing a motion to suppress admissions of a defendant on the grounds that they were made during a custodial interrogation without *Miranda* warnings, we must accept the district court's findings of fact on the circumstances surrounding a confession unless clearly erroneous, but must make an independent determination on the issue of voluntariness. *See Braxton*, 112 F.3d at 781.

On the morning of January 20th, two law enforcement agents traveled to Webb's home and parked on the street to wait for him to leave for work. Webb came out at approximately 7:00 a.m. and drove down his driveway. The agents then pulled forward to block the driveway, got out of their car, and asked to speak with Webb about his employment at PDS. Webb told the agents that he needed to take his son to the bus stop at a local store first, but that they could follow him to the store. The agents agreed. At the store, Webb dropped his son off and entered the store alone. After returning with a cup of coffee, Webb spoke briefly with the agents. The agents, however, told Webb

that they would prefer to return to Webb's home for the interview, and Webb agreed. After returning to Webb's home, Webb and the agents began to speak on Webb's deck, but because of the January weather, the agents asked to go inside. The men then entered Webb's home, where Webb closed his dog in another room before sitting down for the interview. Webb also paused to make a telephone call to his employer to let them know he would be late for work. The interview lasted approximately one and one-half hours, during which time Webb admitted padding the VDOT bills on PDS's behalf.

After receiving evidence concerning the events on that day, the district court found that the officers were not required to give Webb *Miranda* warnings and that the statements made by Webb during the interview in his home were voluntary. Considering the totality of the circumstances, we agree. Prior to the interview at his home, Webb was never placed under arrest, handcuffed, or otherwise restrained. Webb was interviewed in familiar surroundings, in his own home, for a reasonable period of time, where his movements were not restricted. No threats or promises were made to obtain his cooperation, nor was intimidation brought to bear upon him. Indeed, Webb testified that he agreed to speak with the agents both at the store and on the deck of his home.

Nonetheless, Webb asserts on appeal that his admissions were not made voluntarily because one agent got out of his car "brandishing" a sidearm when Webb was first leaving his home, the agents insisted on going inside instead of staying on the deck when they returned for the interview, and he eventually asked for an attorney. We are unpersuaded. First, Webb's own account of the events that morning do not substantiate Appellants' exaggerated claim that "[o]ne of the agents got out of the car brandishing his sidearm." Appellants' Brief at 17. Webb testified, in response to a question as to whether he knew the agent approaching his car was a law enforcement officer, that he "notice[d] that [the officer] was *wearing* a side arm," J.A. 337 (emphasis added), but made no claim that a side arm was "brandished." Second, like the district court, we cannot infer that the agents' request that the interview take place inside Webb's home instead of on the deck somehow turned the interview coercive as opposed to consensual in nature, especially given the fact that it took place in the month of January. Third, and with regard to the only matter in direct dispute, we

cannot say that the district court's finding that the evidence was insufficient to find that Webb requested an attorney was clearly erroneous.

In sum, we are at best left with Webb's after-the-fact assertion that he felt he had little or no choice but to accede to the agents' request for an interview, which is entitled to limited consideration given the totality of the circumstances before us. *See Braxton*, 112 F.3d at 781 ("Subsequent testimony by an accused about his prior subjective mental impressions and reactions must be carefully scrutinized, as such testimony is always influenced by his self-interest." (internal quotation marks and alterations omitted)). Webb failed to establish that the law enforcement agents were so intimidating or overpowering as to overcome his will to resist. Because this was not a custodial situation, the district court did not err in concluding that *Miranda* warnings were not required and, consequently, in refusing to suppress Webb's statements.

## C.

PDS separately challenges the district court's admission of the incriminating statements made by Webb to the law enforcement agents on January 20, 1999, as well as Webb's statements made to the government informant and tape-recorded by the informant prior to that time. Specifically, PDS asserts that because Webb did not testify at trial, the admission of Webb's statements against PDS violated PDS's Sixth Amendment right to confrontation. *See Bruton v. United States*, 391 U.S. 123, 126 (1968). The district court ruled that the statements were admissible under Rule 801(d)(2)(D) of the Federal Rules of Evidence and that their admission into evidence did not violate PDS's Sixth Amendment right to confrontation.

"Because a corporation can act only through its employees, a statement by a corporate official . . . can certainly be considered an admission by a corporate defendant." *United States v. Brothers Constr. Co.*, 219 F.3d 300, 310-11 (4th Cir.), *cert. denied*, 121 S. Ct. 628 (2000). And, under Rule 801(d)(2)(D), an out-of-court statement offered as evidence at trial is not considered hearsay if "[t]he statement is offered against a party and is . . . a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship." Fed. R.

Evid. 801(d)(2)(D). There is no dispute that the statements Webb made to the government informant (a co-employee) and to the law enforcement agents concerned Webb's billing practices and procedures at PDS while he was employed as the manager of the photogram department. Thus, the statements concerned matters within the scope of Webb's employment with PDS, made during the existence of the employment relationship, and were admissible against PDS under Rule 801(d)(2)(D). *See Brothers*, 219 F.3d at 309-311 (holding that grand jury testimony of officer and in-house counsel for corporate defendant was properly admitted as admission against the corporate defendant). Indeed, PDS seemingly agrees that Webb's statements would be admissible under the provisions of Rule 801(d)(2)(D), contending instead that the admission of Webb's statements against PDS was improper because it nevertheless ran afoul of PDS's constitutional right of confrontation. We disagree that admission of the statement was error.

The Confrontation Clause of the Sixth Amendment guarantees the right of a criminal defendant "to be confronted with the witnesses against him." U.S. Const. amend. VI. But while "the Confrontation Clause reflects a preference for face-to-face confrontation at trial," *Ohio v. Roberts*, 448 U.S. 56, 63 (1980) (footnote omitted), it does not foreclose the admission of all hearsay statements when the declarant is unavailable, *see id.* at 64. Rather, "[r]eflecting its underlying purpose to augment accuracy in the factfinding process by ensuring the defendant an effective means to test adverse evidence," the Confrontation Clause does not prohibit the introduction of hearsay statements of an unavailable declarant which are "marked with such trustworthiness that there is no material departure from the reason of the general rule." *Id.* at 65 (internal quotation marks omitted). "'The focus of the Court's concern has been to insure that there are indicia of reliability which have been widely viewed as determinative of whether the statement may be placed before the jury though there is no confrontation of the declarant, and to afford the trier of fact a satisfactory basis for evaluating the truth of the prior statement.'" *Id.* (internal citation omitted) (quoting *Mancusi v. Stubbs*, 408 U.S. 204, 213 (1972)). From these principles, the Court has held that a hearsay statement is admissible and does not violate the Confrontation Clause where the witness is unavailable and the statement bears sufficient "indicia of reliability" in that it falls within a "firmly rooted hearsay

exception," or has "particularized guarantees of trustworthiness." *Id.* at 65-66; *see also Lilly v. Virginia*, 527 U.S. 116, 124-25 (1999) (plurality).

First, a hearsay exception is "firmly rooted" if it "rest[s] upon such solid foundations that admission of virtually any evidence within [it] comports with the 'substance of constitutional protection.'" *Roberts*, 448 U.S. at 66. For example, in *United States v. Saks*, 964 F.2d 1514 (5th Cir. 1992), the Fifth Circuit identified several "firmly rooted" exceptions to the hearsay prohibition that would serve as exceptions to *Bruton*: the hearsay exception for co-conspirators in Rule 801(d)(2)(E), the "spontaneous declaration" exception in Rule 803(2), and the "medical examination" exception in Rule 803(4) of the Federal Rules of Evidence. *See id.* at 1525; *White v. Illinois*, 502 U.S. 346, 356 (1992); *see also Bourjaily v. United States*, 483 U.S. 171, 183 (1987) (holding that "no independent inquiry into reliability is required when the evidence falls within a firmly rooted hearsay exception" like that for co-conspirators under Rule 801(d)(2)(E) (internal quotation marks omitted)); *United States v. Shores*, 33 F.3d 438, 442 (4th Cir. 1994) (observing that *Bruton* does not apply if the non-testifying co-defendant's statement is admissible as a nonhearsay statement under Fed. R. Civ. P. 801(d)(2)(E)); *Folston v. Allsbrook*, 691 F.2d 184, 187 (4th Cir. 1982) (same).

Failing to see any meaningful distinction between Rule 801(d)(2)(E) and Rule 801(d)(2)(D) for purposes of *Bruton*, the *Saks* court held that the agency exception set forth in Rule 801(d)(2)(D) "is equally rooted in our jurisprudence," *Saks*, 964 F.2d at 1525, and, therefore, "if statements meet the requirements of Rule 801(d)(2)(D) . . . the Confrontation Clause is satisfied," *id.* at 1526; *see also United States v. Walker*, 148 F.3d 518, 522 (5th Cir. 1998). Consequently, the court ruled that the prior testimony of defendant's business partner, offered in a prior civil suit pertaining to the alleged criminal acts, was admissible against the defendant in his subsequent criminal suit. *See Saks*, 964 F.2d at 1526.

PDS asserts, however, that the *Saks* court overlooked the fact that current Rule 801(d)(2)(D) broadened the traditional exception for agents' statements in our jurisprudence, which only allowed for the admission of statements "made by the agent acting in the scope of his

employment," and not for all "statements related to a matter within the scope of the agency or employment." Fed. R. Evid. 801(d)(2)(D) advisory committee's note; *see also United States v. King*, 134 F.3d 1173, 1174 n.1 (2d Cir. 1998) (noting that "[s]ection 801(d)(2)(D) broaden[ed] the prior definition of admissible statements of agents," but finding it unnecessary to "decide whether this broadening renders the current version not 'firmly rooted' as a hearsay exception, for purposes of the Confrontation Clause" (internal citation omitted)). Thus, PDS contends that while statements made by Webb to his co-employee during the course of his employment might fall within the historical exception to the hearsay rule, Webb's statements to the law enforcement agents during the interview at his home would not fall within this traditional, or "firmly rooted," exception because he was not acting within the scope of his employment at the time he made the statements.

Although PDS correctly notes that Rule 801(d)(2)(D) broadened the original exception for the admissibility of hearsay statements made by an agent against the agent's employer, we need not decide whether Webb's statements to the law enforcement officials in his home, which clearly fall within the current hearsay exception of Rule 801(d)(2)(D), would also fall within a "firmly rooted" exception to the hearsay rule. Even were we to assume that they do not, the statements contain "particularized guarantees of trustworthiness" such that they need not be subjected to the adversarial testing normally required by the Confrontation Clause.

PDS disagrees, asserting that Webb's statements cannot satisfy the second prong of the *Ohio v. Roberts* test because the Court has firmly held to the general rule that an accomplice's confession that incriminates a defendant is presumptively unreliable. *See Lee v. Illinois*, 476 U.S. 530, 541 (1986). But while PDS's recitation of the general rule is an accurate one, it fails to recognize that the Court's holding in this regard was premised upon the "basic understanding that when one person accuses another of a crime under circumstances in which the declarant stands to gain by inculpating another, the accusation is presumptively suspect and must be subjected to the scrutiny of cross-examination." *Id.* In other words, when a defendant, in the hopes of helping himself, has made a statement which shifts or spreads blame to another defendant or accomplice, the Court has held that statement

does not fall within a firmly rooted exception to the hearsay rule and falls outside the realm of trustworthy hearsay statements in general. *See Lilly*, 527 U.S. at 134.

This presumption of unreliability, however, is just that — a presumption. It may be rebutted if the statement "is supported by a showing of particularized guarantees of trustworthiness." *Lee*, 476 U.S. at 543 (internal quotation marks omitted). And, consistent with the basis upon which the presumption rests, the Supreme Court has also recognized that "the very fact that a statement is genuinely self-inculpatory" — rather than an attempt to shift blame or curry favor — "is itself one of the 'particularized guarantees of trustworthiness' that makes a statement admissible under the Confrontation Clause." *Williamson v. United States*, 512 U.S. 594, 605 (1994).

We hold that the self-inculpatory statements of Webb contain such "particularized guarantees of trustworthiness" and were properly admitted as evidence against PDS. First, neither *Lee* nor *Lilly* involved the question of the admissibility of an employee's inculpatory statements against his corporate employer, or the question of the criminal liability of the corporate employer based upon the agency relationship with the declarant. Indeed, aside from the question of whether Rule 801(d)(2)(D) is a firmly rooted hearsay exception, we note that the commentary to the current version of the Rule itself recognizes "the reliability and reasonableness of admitting" inculpatory statements made by an employee concerning the very tasks that "he was hired to do." 30B Michael H. Graham, *Federal Practice & Procedure* § 7023 (2000). The inherent reliability and reasonableness of admitting such statements as evidence against the employer is even more compelling where, as here, the statement is inculpatory of the employee and, thereby, his employer, but is not exculpatory of the employee. Webb's statements admitting that he inflated the VDOT invoices were genuinely self-inculpatory and, while also inculpatory of PDS, the statements in no way attempted to shift blame to another or curry favor at the expense of others. Nor are we persuaded by PDS's argument that we should regard Webb's self-inculpatory statements as unreliable because Webb made a reference to his predecessor at PDS engaging in similar actions. Webb's reference to his predecessor was fleeting at best and, instead of attempting to shift blame, Webb implicated himself in criminal conduct from the

moment he became the photogram manager to the exclusion of all others.

For the same reasons, we reject PDS's claim that because Webb's statements were procured either by law enforcement agents or by the informant, the presumption of unreliability cannot be rebutted. This argument is premised upon the plurality's statement in *Lilly* that "[i]t is highly unlikely that the presumptive unreliability *that attaches to accomplices' confessions that shift or spread blame* can be effectively rebutted when . . . the government is involved in the statements' production, and when the statements describe past events and have not been subjected to adversarial testing." *Lilly*, 527 U.S. at 137 (emphasis added). Relying upon this statement, PDS argues that an accomplice's hearsay statement cannot be admitted against a defendant whenever the government has been involved in the production of the statement. We do not read *Lilly* so broadly, nor are we inclined to adopt such an all-encompassing rule of exclusion. Webb's self-inculpatory statements, although made to law enforcement agents and the agents' informant, made no attempt to "shift or spread blame" to another.

In summary, Webb's statements are not analogous to those statements made by a defendant who seeks to shift blame to another for conduct in which the two were involved, thereby calling the reliability of the statements about his co-defendant into question.[1] In such cases, "[t]he danger against which the Confrontation Clause was erected — the conviction of a defendant based, at least in part, on presumptively unreliable evidence —" is present. *Lee*, 476 U.S. at 543. Here, Webb's statements are not fairly characterized as presumptively unreliable and bore sufficient "indicia of reliability" to be admissible against his employer. Because Webb's self-inculpatory admissions to the agents are among those statements which carry "particularized

---

[1]PDS also claims that Webb made the statements in a setting that Webb perceived to be coercive, possibly creating an incentive for Webb to tell the agents what he may have thought they wanted to hear to get them to leave. Webb and PDS, of course, failed to substantiate the claim that Webb's interview by the two agents in his home was "coercive" in nature, and even Webb never claimed that he proceeded to make self-inculpatory statements just to get the agents to leave.

guarantees of trustworthiness," they were properly admissible under the Confrontation Clause. Accordingly, the district court did not err in admitting Webb's statements against PDS under Rule 801(d)(2)(D), and did not violate PDS's rights under the Confrontation Clause in doing so.

### III.  *Mail Fraud Convictions*

#### A.

Appellants challenge their convictions for mail fraud under 18 U.S.C.A. § 1341, asserting (1) that Congress did not intend for the mail fraud statute to apply to mailings placed with private or commercial *interstate* carriers for the purpose of executing a fraudulent scheme if the mailing itself only actually travels *intrastate*, and (2) that if the statute is interpreted otherwise, the statute exceeds Congress's power under the Commerce Clause.

The mail fraud statute provides in pertinent part that:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, . . . for the purpose of executing such scheme or artifice or attempting so to do, *places in any post office or authorized depositor for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or deposits or causes to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier*, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail or such carrier according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined under this title or imprisoned not more than five years, or both.

18 U.S.C.A. § 1341 (emphasis added).

In this case, the fraudulent invoices prepared by PDS on the VDOT jobs were always mailed from PDS's offices in Virginia to VDOT's prime contractors in Virginia through either the United States Postal Service or the United Parcel Service ("UPS"). Although the government was unable to present evidence as to which carrier was used for any particular invoice or that any particular invoice actually crossed state lines in route from PDS to the prime contractor, it did successfully prove that one of these interstate carriers (the Postal Service or UPS) was always used to execute the fraudulent overbilling scheme.[2] The district court concluded that the jurisdictional requirement of the mail fraud statute was satisfied because UPS was a commercial interstate carrier and that, although the government could not establish that the invoices deposited for delivery with UPS actually traveled interstate, such was not required. We agree.

1.

We first address Appellants' assertion that Congress did not intend for the "private or commercial interstate carrier" provision to extend coverage of the mail fraud statute to the use of interstate carriers when the item deposited for delivery to further the fraudulent scheme actually travels only intrastate. Specifically, they assert that the language of § 1341 is ambiguous as to the question of whether it applies to intrastate deliveries of matters or things deposited with a private or commercial interstate carrier, or only to matters or things delivered interstate, that the legislative history counsels that we adopt the more narrow construction, and that as a last resort we should apply the rule of lenity to overturn their convictions.

Our first step in analyzing the meaning of the statute is to "determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case." *Robinson*

---

[2]Relevant to this issue, the jury was instructed that to convict of mail fraud, it must find "beyond a reasonable doubt that the use of the mails or the interstate commercial carrier furthered or advanced or carried out in some way the scheme or plan to defraud or to obtain money or property by means of fraudulent representations," and also that "an interstate commercial carrier is a carrier . . . engaged in transporting persons or property across state lines." J.A. 556-57.

*v. Shell Oil Co.*, 519 U.S. 337, 340 (1997). "If the language is plain and the statutory scheme is coherent and consistent, we need not inquire further." *Holland v. Big River Minerals Corp.*, 181 F.3d 597, 603 (4th Cir. 1999) (internal quotation marks omitted), *cert. denied*, 528 U.S. 1117 (2000). "The plainness or ambiguity of the statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." *Robinson*, 519 U.S. at 341. As a general rule, only "[i]f the statutory language is ambiguous[ ] [do] we look beyond the language of the statute to the legislative history for guidance." *Holland*, 181 F.3d at 603 (internal quotation marks omitted). And, then, "[i]f congressional intent is not apparent from an examination of the legislative history, we apply the traditional tools of statutory construction." *Id.* (internal quotation marks omitted).

Prior to 1994, the mail fraud statute criminalized the use of the United States Postal Service to execute a fraudulent scheme, but had no application to private or commercial interstate carriers. *See United States v. Lefkowitz*, 125 F.3d 608, 617 (8th Cir. 1997). Then, as now, the statute made no distinction between intrastate and interstate mailings, and it had been extended to both as a proper exercise of the Postal Power. *See United States v. Elliott*, 89 F.3d 1360, 1364 (8th Cir. 1996) (holding that "the jurisdictional basis of the mail fraud statute is grounded in the Postal Power and therefore necessarily encompasses all items passing through the United States mails, even if their passage is purely intrastate").

In 1994, however, Congress broadened the application of the mail fraud statute to also criminalize "deposit[ing] or caus[ing] to be deposited any matter or thing whatever to be sent or delivered by any *private or commercial interstate carrier*" for the purpose of carrying out a scheme or artifice to defraud. Violent Crime Control and Law Enforcement Act of 1994, Pub. L. No. 103-322, § 250006, 108 Stat. 1796, 2087 (1994) (emphasis added). Although the amendment was added pursuant to the Commerce Clause power, and was obviously intended to extend the mail fraud statute to reach those defendants who use commercial interstate carriers such as UPS and Federal Express in lieu of the United States Postal Service, Congress added no distinction which would serve to exempt from the statute's

intended reach intrastate mailings handled by such private or commercial interstate carriers.

We believe that the unambiguous language of current § 1341 criminalizes all mailings in furtherance of a fraudulent scheme if the mailings are placed with either the United States Postal Service or with other private or commercial mail delivery services which operate interstate, regardless of whether any particular mailing actually crosses state lines. Had Congress intended to criminalize only interstate deliveries by such interstate private or commercial carriers, and thereby create a different jurisdictional requirement when such carriers are used in lieu of the United States Postal Service, it could easily have done so. For example, the drafters need only have inserted the words "interstate" or "across state lines" immediately after the phrase "sent or delivered." Instead, Congress elected to use virtually identical language as that dealing with the use of the United States mail; *i.e.*, imposing criminal liability when one "places in any post office or authorized depository for mail matter, *any matter or thing whatever to be sent or delivered by the Postal Service*, or deposits or causes to be deposited *any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier*" for the purpose of executing the scheme to defraud. 18 U.S.C.A. § 1341. (emphasis added). Consequently, we find no indication that Congress, in amending a statute which criminalizes depositing things with the United States Postal Service for delivery, interstate or intrastate, intended to limit the extension to private and commercial interstate carriers for only interstate deliveries. On the contrary, we think it obvious that Congress intended to prohibit the use of private and commercial interstate carriers to further fraudulent activity in the same way such use of the United States mail had long been prohibited.

Although we discern no ambiguity in congressional intent to criminalize such conduct, we are also unpersuaded by Appellants' assertion that the legislative history of the 1994 amendment indicates that Congress did not intend to extend the reach of the mail fraud statute to situations in which a private or commercial interstate carrier delivers the particular mailing only intrastate. Courts are to "venture beyond the plain meaning of a statute only in those rare instances in which there is 'a clearly expressed legislative intent to the contrary.'" *Holland*, 181 F.3d at 603 n.2 (quoting *Russello v. United States*, 464 U.S.

16, 20 (1983)). Although Appellants argue that references were made in the legislative history to increased interstate deliveries by facilities other than the United States Postal Service as a reason to amend the statute, they candidly acknowledge that the legislative history is silent regarding whether the amendment was intended to be applicable only to interstate deliveries by such private and commercial interstate carriers.

For similar reasons, we reject Appellants' argument that we should apply the rule of lenity to overturn the mail fraud convictions. The rule of lenity generally calls for courts to construe ambiguous criminal statutes against the government and in favor of the defendant. *See United States v. Hall*, 972 F.2d 67, 69 (4th Cir. 1992) ("Under the rule of lenity any criminal statute . . . must be construed in favor of the accused and against the government if it is ambiguous"). However, "a provision is [not] 'ambiguous for purposes of lenity merely because it [is] *possible* to articulate a construction more narrow than that urged by the Government.'" *See United States v. Ehsan*, 163 F.3d 855, 857 (4th Cir. 1998) (alterations in original) (quoting *Moskal v. United States*, 498 U.S. 103, 108 (1990). And, "[t]he simple existence of some statutory ambiguity . . . is not sufficient to warrant application of th[e] rule, for most statutes are ambiguous to some degree." *Muscarello v. United States*, 524 U.S. 125, 138 (1998). "Rather, there must be a 'grievous ambiguity or uncertainty in the language and structure of the Act, such that even after a court has seize[d] everything from which aid can be derived, it is still left with an ambiguous statute.'" *Ehsan*, 163 F.3d at 858 (alteration in original) (quoting *Chapman v. United States*, 500 U.S. 453, 463 (1991). Because we conclude that the meaning of § 1341 is unambiguous, the rule of lenity is inapplicable. The statute prohibits the act of depositing or causing to be deposited any matter or thing to be delivered by the Postal Service or by any private or commercial interstate carrier for the purpose of executing a scheme or artifice to defraud, irrespective of whether the matter or thing deposited for delivery is intended to or acually does travel interstate or intrastate.

2.

Having determined that the mail fraud statute applies to the use of private and commercial interstate carriers to execute a fraudulent

scheme, regardless of whether the particular matter deposited for delivery actually travels across state lines, we turn to the question of whether the mail fraud statute, when applied to the use of a private or commercial interstate carrier employed solely to deliver an item intrastate, is a permissible exercise by Congress of its power under the Commerce Clause. U.S. Const. art. I, § 8, cl. 3 ("Congress shall have the Power . . . To regulate Commerce . . . among the several States. . . .").

In *United States v. Lopez*, 514 U.S. 549 (1995), the Supreme Court identified three broad categories of activity that Congress may regulate under its commerce power. "First, Congress may regulate the use of the channels of interstate commerce. Second, Congress is empowered to regulate and protect the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities. Finally, Congress's commerce authority includes the power to regulate those activities having a substantial relation to interstate commerce, *i.e.*, those activities that substantially affect interstate commerce." *Id.* at 558-59 (citations omitted). The district court concluded that the 1994 amendment to the mail fraud statute to encompass private and commercial interstate carriers was a permissible exercise of Congress's authority under the second *Lopez* category, *i.e.*, the authority to regulate instrumentalities of interstate commerce. We agree.

Private and commercial interstate carriers are facilities or instrumentalities of interstate commerce, which Congress can regulate and protect from harm, "even though the [particular] threat may come only from [an] intrastate activit[y]." *Lopez*, 514 U.S. at 558; *cf. Shreveport Rate Cases*, 234 U.S. 342, 351 (1914) (noting that Congress's authority to protect and advance interstate commerce extends to interstate carriers as instruments of interstate commerce: "the fact that carriers are instruments of intrastate commerce, as well as interstate commerce, does not derogate from the complete and paramount authority of Congress over the latter, or preclude the Federal power from being exerted to prevent the intrastate operations of such carriers from being made a means of injury to that which has been confided to Federal care."); *Southern Ry. Co. v. United States*, 222 U.S. 20, 27 (1911) (noting that railroads "are highways of both interstate and intrastate commerce" and that the Safety Appliance Act may be made

applicable to all railway vehicles, even those used only in intrastate commerce, under Congress's plenary power to regulate interstate commerce). Thus, when Congress acts to regulate or protect an instrumentality of interstate commerce under the second *Lopez* category, "federal jurisdiction is supplied by the nature of the instrumentality or facility used, not by separate proof of interstate movement," and "federal jurisdiction based on *intra*state use of *inter*state facilities is an appropriate exercise of the commerce power." *United States v. Marek*, 238 F.3d 310, 317 (5th Cir. 2001) (footnotes omitted), *petition for cert. filed*, 69 U.S.L.W. 3673 (U.S. Apr. 4, 2001) (No. 00-1526).

In *Marek*, a defendant's intrastate use of Western Union, an instrumentality of interstate commerce, to transfer payment to a hit man was found to be sufficient to permit the court to exercise jurisdiction under the federal murder-for-hire statute, 18 U.S.C.A. § 1958 (West 2000), even though the wire transfer was initiated in Houston, Texas and received in Harlingen, Texas, and the government introduced no evidence that the transmission ever actually crossed the Texas state line en route between the two points. After determining that the language of the statute applied to such intrastate uses of interstate instrumentalities, the court concluded that the statute was also a permissible exercise of Congress's power under the Commerce Clause. As support, the court endorsed the similar conclusion reached by the district court in this case with respect to the 1994 amendment to the mail fraud statute:

> [T]hrough passage of a 1994 amendment to the federal mail fraud statute, Congress expanded 18 U.S.C. § 1341 to reach private interstate commercial carriers, such as Emery, DHL, and Federal Express, in addition to the U.S. Postal Service. Although no circuit court has addressed whether that amendment requires the crossing of state lines to establish jurisdiction, one district court recently held that the amended statute does cover "purely intrastate delivery of mails by private or commercial carriers as long as those carriers engage in interstate deliveries. . . . While jurisdiction lies only under the Commerce Clause for the use of private or commercial carriers, Congress may still regulate their intrastate activities because they are instrumentalities of interstate commerce." Here again, the conclusion is appro-

priate because intrastate use of interstate facilities is properly regulated under Congress's second-category *Lopez* power.

*Marek*, 238 F.3d at 318 (footnote omitted) (quoting *Photogrammetric Data Services*, 103 F. Supp. 2d at 882).

Other courts have reached similar conclusions, upholding convictions based upon criminal statutes which serve to protect instrumentalities of interstate commerce even though the specific conduct involved arose from intrastate activities. For example, in *United States v. Baker*, 82 F.3d 273 (8th Cir. 1996), the Eighth Circuit upheld the conviction of a police officer under the Travel Act, *see* 18 U.S.C.A. § 1952(a) (West 2000), premised upon extortion activity in which the officer escorted his victim, a man he had arrested, to an automatic teller machine to withdraw money in return for being released from custody. Because an interstate network of automatic teller machines is a facility in interstate commerce, the court held, it falls within the second prong of *Lopez*, subject to regulation even though the withdrawal in question triggered an entirely intrastate electronic transfer. *See id.* at 275-76. Similarly, in *United States v. Gilbert*, 181 F.3d 152 (1st Cir. 1999), the court upheld a conviction under 18 U.S.C.A. § 844(e) (West 2000), premised upon the use of a telephone to make a bomb threat, even though there was no evidence that the threat was routed through an interstate system. "[B]ecause a telephone is an instrumentality of interstate commerce," the court held, "this alone is a sufficient basis for jurisdiction based on interstate commerce." *Id.* at 158; *see also United States v. Heacock*, 31 F.3d 249, 255 (5th Cir. 1994) (holding that "whenever a person uses the United States Post Office to deposit, to transport, and to deliver parcels, money, or other material by means of the mail, that person clearly and unmistakably has used a 'facility in interstate commerce,' irrespective of the intrastate destination of the item mailed," and that such intrastate use satisfies the jurisdictional requirement of the Travel Act); *United States v. Clayton*, 108 F.3d 1114, 1117 (9th Cir. 1997) (holding that because cellular telephones and cellphone ID numbers are instrumentalities of interstate commerce, protectable under the second category of *Lopez*, no further inquiry was necessary to sustain conviction under 18 U.S.C.A. § 1029(a) (West 2000)); *United States v. Kunzman*, 54 F.3d 1522, 1527 (10th Cir. 1995) ("As

long as the instrumentality used is itself an integral part of an inter-state system, Congress may regulate intrastate activities involving the use of the instrumentality. . . .")[3]

In its current form, the mail fraud statute prohibits one from "depo-sit[ing] or caus[ing] to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier" for the purpose of executing a scheme or artifice to defraud. 18 U.S.C.A. § 1341. As such, it too constitutes a permissible exercise of Congress's power to protect interstate facilities from being utilized to accomplish fraudulent goals.

3.

Because we find the language of the mail fraud statute to be unam-

---

[3]We pause briefly to address Appellants' suggestion that Congress intended the mail fraud statute, like the wire fraud statute, to be a regula-tion of the "use of channels of interstate commerce" under the first *Lopez* category and, therefore, that we should look to the wire fraud statute, which requires proof that a wiring actually crossed state lines, for guid-ance in interpreting the mail fraud statute. *See e.g.*, *United States v. Darby*, 37 F.3d 1059, 1067 (4th Cir. 1994) (holding that "while the Gov-ernment was required to prove that [the defendant]'s phone call crossed a state line . . ., the Government did not need to prove that [the defen-dant] knew of the interstate nexus.").

In contrast to the mail fraud statute, the wire fraud statute criminalizes a communication in interstate commerce, providing that it is a crime to "transmit[ ] or cause[ ] to be transmitted by means of wire, radio, or tele-vision communication *in interstate or foreign commerce*, any writings, signs, signals, pictures, or sounds for the purpose of executing [a] scheme or artifice" to defraud, 18 U.S.C.A. § 1343 (West 2000) (empha-sis added), whereas the mail fraud statute criminalizes the act of deposit-ing or causing to be deposited "any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier," 18 U.S.C.A. § 1341. In other words, the language of the wire fraud statute requires that a communication actually travel "in interstate or foreign commerce," whereas the language of the mail fraud statute requires only that a mail-ing be deposited with an "interstate carrier." Given these significant tex-tual differences, we do not find the wire fraud statute to be helpful to our inquiry.

biguous, and that Congress's authority under the Commerce Clause extends to protect the instrumentalities of interstate commerce from being used to further fraudulent activity even if the use itself is purely intrastate, the rule of constitutional doubt raised by Appellants is likewise inapplicable. As Appellants note, "where a statute is susceptible of two constructions, by one of which grave and doubtful constitutional questions arise and by the other of which such questions are avoided, our duty is to adopt the latter." *Jones v. United States*, 529 U.S. 848, 857 (2000) (internal quotation marks omitted). However, we do not view the language of § 1341 as susceptible to the construction advanced by Appellants, at least not without considerable strain; nor do we discern a "grave and doubtful constitutional question[ ]" to arise from the construction we have settled on. *Id.*

We are similarly unpersuaded by Appellants' suggestion that Congress's decision to protect private and interstate commercial carriers, in addition to the United States Postal Service, from being utilized to further fraudulent schemes where the use itself is intrastate, runs afoul of the respected federal-state balance. *See e.g.*, *id.* at 858 (holding that application of federal arson statute to a private home would federalize a typically state crime and, thereby, "significantly change[ ] the federal-state balance in the prosecution of crimes") (internal quotation marks omitted); *United States v. Bass*, 404 U.S. 336, 349 (1971) (noting policy that "unless Congress conveys its purpose clearly, it will not be deemed to have significantly changed the federal-state balance. Congress has traditionally been reluctant to define as a federal crime conduct readily denounced as criminal by the States."). The mail fraud statute prohibits use of the United States Postal Service and other private or commercial *interstate* carriers to further a fraudulent scheme; it does not attempt to criminalize such injurious *intrastate* use of a private or commercial *intrastate* carrier or delivery service.

### 4.

To conclude, we hold that the mail fraud statute criminalizes the use of private and commercial interstate carriers to execute fraudulent schemes to the same extent that the statute criminalizes such use of the United States mail. The jurisdictional element of the mail fraud statute is satisfied by defendant's act of depositing the matter or thing with a private or commercial interstate carrier, even though the deliv-

ery may be only intrastate. We also hold that criminalizing such conduct is a permissible exercise of Congress's power under the Commerce Clause to protect private and commercial interstate carriers from the burdens of being used to execute fraudulent schemes.

B.

Appellants also challenge their mail fraud convictions on the grounds that the district court's mail fraud instruction impermissibly broadened the charges in the indictment. Specifically, Appellants assert that the district court erred in failing to instruct the jury that it must find that the four invoices specified in the indictment were delivered by mail or interstate carrier *and* that they were false or fraudulent. This failure, Appellants assert, broadened the possible bases for conviction beyond the grounds alleged in the indictment, thereby constructively amending the indictment and constituting error *per se*. *See e.g.*, *United States v. Randall*, 171 F.3d 195, 203 (4th Cir. 1999), *cert. denied*, 121 S. Ct. 248 (2000); *United States v. Floresca*, 38 F.3d 706, 710 (4th Cir. 1994) (en banc). We disagree.

The indictment charged Appellants with four counts of mail fraud. After describing the scheme to defraud, the indictment goes on to identify four specific dates on which the Appellants deposited four specific invoices for delivery by mail or interstate commerce carrier "for the purpose of executing and attempting to" execute the scheme to defraud. J.A. 47. The indictment did not charge that the four individual invoices sent by mail or interstate carrier were themselves false or fraudulent, but rather only that the over-billing scheme was false and fraudulent and that the mailings were in furtherance of the scheme. Nor does the mail fraud statute require such a charge.

It is well-settled that a conviction for mail fraud requires a showing of (1) knowing participation in a scheme to defraud, and (2) a mailing in furtherance of the scheme. *See United States v. Dozie*, 27 F.3d 95, 97 (4th Cir. 1994) (per curiam). The use of the mails, however, need not be an essential element of the scheme to be part of the execution of the fraud. Rather, it need only "be incident to an essential part of the scheme or a step in the plot." *Schmuck v. United States*, 489 U.S. 705, 710-11 (1989) (internal citations and quotation marks omitted). Accordingly, Appellants' mail fraud convictions did not require the

government to prove that the four invoices referenced in the indictment were false or fraudulent, but only that they were placed in the mails in furtherance of the fraudulent scheme. *See id.* at 715 (noting that "'innocent' mailings — ones that contain no false information — may supply the mailing element").

Also, while the district court's standard mail fraud instruction did not specifically refer to the invoices set forth in the indictment, the indictment provided to the jury clearly referenced and described the four invoices which served as the basis for the four separate mail fraud counts and identified each as a separate count, and the jury was instructed that it must consider each alleged offense or count separately. The court also instructed the jury that it must determine that the Appellants used the mails or an interstate commercial carrier to advance the scheme to defraud, and that the government must prove that the mails or an interstate commercial carrier were used in some manner to further, advance, or carry out the scheme to defraud. We conclude that the district court's instruction did not unconstitutionally broaden the charges in the indictment.

## IV.  *Highway Fraud Convictions*

Appellants also assert that their convictions for highway fraud under 18 U.S.C.A. § 1020 must be reversed because the government failed to prove that they acted willfully, failed to establish that the relevant highway projects were approved by the Secretary of Transportation or a properly authorized delegee of the Secretary, and failed to prove that the false invoices were made in connection with the construction of a highway project. We address each claim in turn.

### A.

We begin with Appellants' contention that willfulness is an essential element of a § 1020 conviction which the government failed to establish. The district court refused Appellants' proffered charge to this effect, instructing the jury instead that it must find that the Appellants made false statements knowingly.

The highway fraud provision, 18 U.S.C.A. § 1020, provides in pertinent part that "[w]hoever . . . *knowingly* makes any false statement,

false representation, false report, or false claim with respect to the . . . cost of any work performed or to be performed . . . in connection with the construction of any highway or related project approved by the Secretary of Transportation . . . [s]hall be fined under this title or imprisoned not more than five years, or both." *Id.* (emphasis added). Thus, the language of the statute requires that a false statement be made knowingly in order to convict, but includes no element of willfulness. Appellants acknowledge as much. However, they contend that we should read an element of willfulness into the statute, primarily because the Federal Highway Administration ("FHWA"), in federal regulation 23 C.F.R. § 633, subpt. C, App. ¶ 5 (1999), has done so.

The FHWA is charged with authorizing federal-aid highway projects. Under Subpart C of the regulation, highway construction contracts under the direct supervision of the FHWA must incorporate a form containing various labor standards provisions set forth in its Appendix A. This form, in turn, includes a provision which reminds contractors that they should "perform their functions as carefully, thoroughly, and honestly as possible," and advises contractors that "[w]illful falsification, distortion, or misrepresentation with respect to any facts related to the project is a violation of Federal law." *Id.* Based upon this, Appellants assert that we should defer to the FHWA's interpretation of § 1020 and also read into § 1020 an element of willfulness. We decline to do so.

For reasons unknown to us, the FHWA requires that the language in its direct construction contracts notify contractors that willfully false statements are a violation of federal law. However, even were we to determine that this reference in the Appendix fairly represents an agency's interpretation of the statute as requiring willfulness in order to convict a contractor of highway project fraud (which we do not), we would owe that interpretation no deference. The text of the statute is unambiguous on this point and the FHWA is not charged with nor granted the authority to interpret or implement § 1020. Consequently, the department's regulation has no effect on how we must interpret the statute. *See e.g.*, *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842-43 (1984). In summary, we decline to read an element of "willfulness" into the

plain and unambiguous text of § 1020.[4] The government was not required to prove "willfulness" to convict Appellants under 18 U.S.C.A. § 1020 and, accordingly, the district court did not err in refusing Appellants' proposed instruction to the contrary.

B.

We next turn to Appellants' assertion that the government failed to prove that the false claims were submitted in connection with a "highway or related project approved by the Secretary of Transportation," 18 U.S.C.A. § 1020, or a properly-authorized delegee of the Secretary, *see* 49 U.S.C.A. § 322(b) (West 1997) (providing that the Secretary of Transportation "may delegate, and authorize successive delegations of, duties and powers of the Secretary to an officer or employee of the Department" and that an officer may in turn "delegate, and authorize successive delegations of, duties and powers of the officer to another officer or employee of the Department").

Appellants assert that their convictions must be reversed because there is no evidence that the Secretary delegated his duty to approve the projects in this case to a natural person. *See Halverson v. Slater*, 129 F.3d 180, 185-86 (D.C. Cir. 1997) (holding that the Secretary may only delegate the powers and duties of the office to a natural person, not to an "administration" or entity other than a natural person). However, at trial, Mr. John Grounds testified that he had been employed by the FHWA for 27 years and had been the financial manager with the FHWA office in Richmond, Virginia, for the past 10

---

[4]Appellants also rely upon a single district court case involving alleged highway fraud under § 1020, in which the court posed the pertinent question for the jury as "whether the government has proved beyond a reasonable doubt that that particular defendant has . . . knowingly and *willfully* by a false statement defrauded the government of the United States with a *specific intent* and purpose of accomplishing a fraud against the United States." *United States v. Molin*, 244 F. Supp. 1015, 1017 (D. Mass. 1965) (emphasis added). The *Molin* case, however, is comprised of nothing more than the court's publication of its jury charge in a § 1020 case which also for unexplained reasons wrote a willfulness requirement into the unambiguous text of § 1020. For the reasons stated, we find this to be improper.

years. He testified that he was authorized on behalf of the Secretary of Transportation to commit the federal funds to pay VDOT for highway projects. There was no evidence presented to dispute Grounds' testimony that he was authorized to approve the relevant highway projects for federal funding. And, Appellants did not challenge at trial his testimony in this regard. Accordingly, we conclude that there was sufficient evidence to support the jury's determination that the false claims submitted by Appellants were submitted in connection with highway projects approved by an authorized delegee of the Secretary of Transportation.

### C.

Finally, Appellants contend that we should reverse their highway fraud convictions because the government failed to prove that the false statements were made "in connection with the construction of [a] highway or related project." 18 U.S.C.A. § 1020. We disagree.

The highway fraud provision, in separate paragraphs, criminalizes the making of false statements in connection with highway projects "submitted for approval to the Secretary" and highway projects "approved by the Secretary":

> Whoever . . . knowingly makes any false statement, false representation, or false report as to the character, quality, quantity, or cost of the material used or to be used, or the quantity or quality of the work performed or to be performed, or the costs thereof in connection with the submission of plans, maps, specifications, contracts, or costs of construction of *any highway or related project submitted for approval to the Secretary of Transportation*; or

> Whoever knowingly makes any false statement, false representation, false report, or false claim with respect to the character, quality, quantity, or cost of any work performed or to be performed, or materials furnished or to be furnished, in connection with the construction of *any highway or related project approved by the Secretary of Transportation*;

18 U.S.C.A. § 1020 (emphasis added), is guilty of highway project fraud.

Appellants were indicted under the second paragraph of § 1020 for their submission of false invoices in connection with the construction of highway projects *already approved* by the Secretary's delegee. Appellants assert, however, that the second paragraph is only applicable to activities associated with actual construction of the highway, and not to preliminary engineering contracts such as that performed by PDS. In other words, Appellants assert that their convictions must be reversed because the second paragraph does not apply to the preliminary engineering work they performed.

We do not read the second paragraph of § 1020 so narrowly. The first paragraph of § 1020 pertains to "false statement[s], false representation[s], or false report[s]" made "in connection with the submission of plans, maps, specifications, contracts, or costs of construction of any highway or related project *submitted for approval* to the Secretary of Transportation," whereas the second paragraph of § 1020 pertains to "false statement[s], false representation[s], false report[s], *or false claim[s]*" made "in connection with the construction of any highway or related project *approved* by the Secretary of Transportation." *Id.* (emphasis added). Contrary to Appellants' proffered interpretation, we do not read the two paragraphs as seeking to distinguish between types of contracts (preliminary engineering contracts for a construction project as opposed to contracts for "actual" construction), but rather as seeking to distinguish between statements made in connection with a highway or related project submitted for approval and statements (including "claims") made in connection with a highway or related project already approved. Under Appellants' strained reading, their services, although performed in connection with an approved highway project, would fall within a gap between the two paragraphs. No such gap exists. Although in the nature of preliminary engineering work, the work of Appellants was furnished in connection with the construction of a highway project approved by the Secretary of Transportation through an authorized delegee.

## V.  *Sentencing*

The district court sentenced PDS concurrently on each count of conviction to one year of probation, a fine of $522,045.29, and resti-

tution of $435,038.33. Webb was sentenced concurrently on each count to 24 months imprisonment, two years of supervised release, and restitution of $435,038.33. The sentences were based upon a calculated loss of $435,038.33 to the victim VDOT as a result of the overbilling scheme. This amount, which resulted in a nine-level increase in the applicable offense level, *see* U.S. Sentencing Guidelines Manual § 2F1.1(b)(1)(J) (1998), was consistent with the admissions of Webb, who had estimated an inflation of ten to fifteen percent per job, or $100,000 to $200,000 per year for five years, and with PDS records reviewed by the investigating agent, which indicated that ten percent of the VDOT jobs for the years at issue totaled just over $452,000.

Appellants assert that the district court improperly based their sentences upon this calculated loss. They contend that the court should have instead calculated their sentences based solely on the loss reflected by the individual invoices listed in the indictment, which they calculate at $19,008 and which would have resulted in only a three-level increase in the applicable offense level. *See* U.S.S.G. § 2F1.1(b)(1)(D). By employing the loss calculation called for by the guidelines, Appellants assert, the loss calculation became the "tail which wags the dog of the substantive offense," in violation of their due process rights as interpreted under *McMillan v. Pennsylvania*, 477 U.S. 79, 88 (1986). In the alternative, Appellants assert that the amount of loss was an essential element of the offenses of conviction not proven beyond a reasonable doubt, requiring that their sentences be reversed in light of the Supreme Court's decision in *Apprendi v. New Jersey*, 530 U.S. 466 (2000). They seek a remand for re-sentencing based upon the amount of loss reflected by the invoices listed in the indictment. Although the Supreme Court decision in *Apprendi* was issued three days after sentencing in this case, the Appellants raised the due process challenge as a *McMillan* issue before the district court. Accordingly, we review the matter de novo.

The Due Process Clause of the Fifth Amendment "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). In *McMillan*, the Supreme Court found constitutional a statute that imposed a mandatory minimum sentence for a defendant who is convicted of speci-

fied felonies when a judge finds by a preponderance of the evidence that the defendant "'visibly possessed a firearm.'" 477 U.S. at 81. Because the statute "neither alter[ed] the maximum penalty for the crime committed nor create[d] a separate offense calling for a separate penalty," *id.* at 87-88, the Court reasoned that the statute merely "limit[ed] the sentencing court's discretion in selecting a penalty within the range already available to it without the special finding of visible possession of a firearm," *id.* at 88. Thus, the statute merely raised the minimum sentence that could be imposed within the permissible statutory range; it was not "tailored to permit the visible possession finding to be a tail which wags the dog of the substantive offense." *Id.*

In *Apprendi*, however, the Court held that the imposition of a sentence in excess of a maximum statutory sentence allowable for an offense, based upon a separate statute allowing for the increase if the sentencing court determined by a preponderance of the evidence that the offense was committed with a racially biased purpose, did violate the defendant's due process rights. Specifically, the Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime *beyond the prescribed statutory maximum* must be submitted to a jury, and proved beyond a reasonable doubt." *Id.* at 490 (emphasis added). But, contrary to Appellants' assertion that *Apprendi* effectively strips *McMillan* of any meaningful vitality and counsels that we require *all* facts that expose a defendant to a sentencing range, whether by statute or by the guidelines, to be proven to a jury beyond a reasonable doubt, the *Apprendi* Court expressly noted that *McMillan* remains good law, albeit limited to cases "that do not involve the imposition of a sentence more severe than the statutory maximum for the offense established by the jury's verdict—a limitation identified in the *McMillan* opinion itself." *Apprendi*, 530 U.S. at 487 n.13; *see also id.* at 495 ("When a judge's finding based on a mere preponderance of the evidence authorizes an increase in the maximum punishment, it is appropriately characterized as "a tail which wags the dog of the substantive offense." (quoting *McMillan*, 477 U.S. at 88)).

In this case, it is undisputed that the fines and terms of imprisonment imposed upon the Appellants were within the statutory maximums allowed for the offenses for which Appellants were convicted.

Consequently, we are not dealing with the imposition of a sentence by a district court which exceeds the applicable statutory maximum. Rather, we are presented with the question of whether facts that serve to increase the defendant's sentence within the maximum sentence authorized by the statute, pursuant to application of the Sentencing Guidelines, must be charged in the indictment and proven to the jury beyond a reasonable doubt. We believe that Appellants' argument in this regard is foreclosed by the Court's holding in *McMillan*, which remains good law, and by our recent decision in *United States v. Kinter*, 235 F.3d 192, 201 (4th Cir. 2000), *cert. denied*, 121 S. Ct. 1393 (2001). In *Kinter*, we held that the "the relevant 'maximum' [sentence] under *Apprendi* is found on the face of the statute rather than in the Sentencing Guidelines," *id.* at 201, and that where the sentences imposed by the sentencing court pursuant to the guidelines are less than the maximum permitted by the statute for the offense for which the defendants were convicted, the factual determinations which increased the defendants' sentences under the applicable guidelines do not run afoul of the due process concerns raised by *Apprendi*, *see Kinter*, 235 F.3d at 198-202 (rejecting due process challenge to district court's findings that increased the sentencing range from ten months to 46 to 57 months). *See also United States v. Obi*, 239 F.3d 662, 667 (4th Cir. 2001), *petition for cert. filed*, ___ U.S.L.W. ___ (U.S. May 8, 2001) (No. 00-9843) (rejecting claim that sentencing based upon drug quantity found by a preponderance of the evidence under the guidelines offends the principles set forth in *Apprendi*).

Nor do we view the sentencing factors based upon additional losses associated with the submission of false invoices in the case before us today as so great or disproportionate as to otherwise implicate due process concerns reserved by *McMillan*; *i.e.*, that sentencing factors, including those that affect the sentencing range within the statutory maximum, should not be permitted to be found by a preponderance of the evidence in the extraordinary case where the factors can be said to be the "tail which wags the dog of the substantive offense." *McMillan*, 477 U.S. at 88. In *United States v. Watts*, 519 U.S. 148 (1997), the Supreme Court reiterated *McMillan*'s holding "that application of the preponderance standard at sentencing generally satisfies due process," but recognized the "divergence of opinion among the Circuits as to whether, in extreme circumstances, relevant conduct that would dramatically increase a sentence must be based on clear and convinc-

ing evidence." *Watts*, 519 U.S. at 156. However, the Court held that the guideline application, which resulted in an increase in the sentencing range from 15-21 months to 27-33 months, did not present an "exceptional circumstance[ ]" as contemplated by *McMillan*. *Watts*, 519 U.S. at 156-57. Nor does the case before us today. *See e.g.*, *United States v. Fenner*, 147 F.3d 360, 366 (4th Cir. 1998) (rejecting argument that increases from 42 years imprisonment to 55 years imprisonment for one defendant and from 115 months imprisonment to 210 months imprisonment were "so profound that it is sufficient to implicate due process concerns or to give the impression of having been tailored to permit the application of [a] cross-reference to be a tail which wags the dog of the substantive offense" (internal quotation marks omitted)); *United States v. Galloway*, 976 F.2d 414, 425-26 (8th Cir. 1992) (holding that a potential increase in a guideline range from 21-27 months to 63-78 months did not raise due process concerns); *cf. United States v. Lombard*, 72 F.3d 170, 186-87 (1st Cir. 1995) (holding that sentencing court may depart downward in an "extreme case" where the application of the § 2K2.1(c)(1)(B) cross-reference to account for a murder charge, of which defendant was acquitted in state court, raised the guideline range from 262-327 months to a mandatory life sentence, but distinguishing "cases involving even sizable sentence increases based on an uncharged quantity of drugs . . . or any number of kindred sentence enhancements").

Because the sentences imposed upon the Appellants were within the statutory maximum sentences for commission of the offenses of conviction, and no other exceptional circumstances are apparent to counsel a different result, we hold that Appellants' constitutional rights were not offended by the loss calculation employed by the district court to impose the sentences at issue. Accordingly, we affirm the Appellants' sentences as well as their convictions.

## VI.  *Conclusion*

For the foregoing reasons, we affirm the Appellants' convictions and sentences.

*AFFIRMED*

WILLIAMS, Circuit Judge, concurring in part and concurring in the judgment:

The majority concludes that the mail fraud statute, when applied to the use of a private or commercial interstate carrier employed solely to deliver an item intrastate, is a permissible exercise of Congress's Commerce Clause power under *Lopez*'s second category. Because I believe that the constitutionality of the mail fraud statute more appropriately is sustained under *Lopez*'s third category, I decline to join Section III A. 2-4 and write separately to explain my reasoning but concur in the remainder of the majority's opinion and in the judgment.

I.

In *United States v. Lopez*, 514 U.S. 549 (1995), the Supreme Court established three categories by which to evaluate Congress's exercise of its Commerce Clause power: Congress may (1) regulate the "use of the channels of interstate commerce"; or (2) "regulate and protect the instrumentalities of interstate commerce, or persons or things in interstate commerce, even when the threat may come only from intrastate activities"; or (3) regulate "activities that substantially affect interstate commerce." *Id.* at 558-59.

Using *Lopez*'s second category, the majority concludes that the mail fraud statute is a regulation that protects private mail carriers, as instruments of interstate commerce, from harm. In so concluding, the majority interprets *Lopez*'s second category in a manner that allows Congress unbounded authority to legislate federal criminal laws that only incidentally involve instrumentalities of interstate commerce, which, in my opinion, leads to an untenable result. *See Gibbs v. Babbitt*, 214 F.3d 483, 490 (4th Cir. 2000) ("It is essential to our system of government that the commerce power not extend to effects on interstate commerce that are so remote that we would effectually obliterate the distinction between what is national and what is local." (internal quotation marks omitted)). Supreme Court precedent analyzing *Lopez*'s second category does not necessitate the majority's broad interpretation of the category. For example, in the *Shreveport Rate Cases*, the seminal opinion involving *Lopez*'s second category, the Supreme Court affirmed Congress's power to regulate the instrumen-

talities' operations and the setting of varying rates and taxes by different states, noting the importance of direct regulation and protection of the instrumentalities of interstate commerce. *Houston, East & West Texas Ry. Co. v. United States (Shreveport Rate Cases)*, 234 U.S. 342, 356-60 (1914). Congress's ability to regulate and protect instrumentalities of interstate commerce stems from the underlying rationale that harm to the instrumentalities necessarily results in harm to interstate commerce generally. *See Southern Ry. Co. v. United States*, 222 U.S. 20, 26-27 (1911) (upholding amendment to Safety Appliance Act, 27 Stat. at L. 531, chap. 196, U. S. Comp. Stat. 1901, p. 3174, 32 Stat. at L. 943, chap. 976, U. S. Comp. Stat. Supp. 1909, p. 1143, which provided for all locomotives, cars, and similar vehicles used on any railway engaged in interstate commerce to be equipped with certain designated safety appliances, regardless of whether the vehicles were used in moving intrastate or interstate traffic); *Perez v. United States*, 402 U.S. 146, 155-156 (1971) ("[F]or example, the destruction of an aircraft (18 U.S.C. § 32), or . . . thefts from interstate shipments (18 U.S.C. § 659)"); *see also United States v. Cobb*, 144 F.3d 319, 321 & n.2 (4th Cir. 1998) (recognizing that the federal carjacking statute fell within *Lopez*'s second category because the statute regulated harm to automobiles). This underlying purpose, however, is not served where, as here, the legislation simply prohibits illegal or immoral use of an instrumentality but does not directly or indirectly regulate the instrumentality to protect it from harm resulting from the improper use.

Moreover, interpreting *Lopez*'s second category to include all improper uses of an instrumentality conflates *Lopez*'s second category with its first, which allows Congress to legislate to keep the channels of interstate commerce free from immoral or injurious uses. Because the mail fraud statute regulates the improper use of an instrumentality but in no way regulates and protects the instrumentality itself, I would hold that *Lopez*'s second category is inapplicable. Instead, I would evaluate the mail fraud statute under *Lopez*'s third category to determine whether the statute, as applied to PDS and Webb's intrastate activities, has a substantial effect on interstate commerce.

II.

To constitute a proper exercise of Congress' power over an intrastate activity under *Lopez*'s third category, the regulated activity must "arise out of or [be] connected with a commercial transaction, which viewed in the aggregate, substantially affects interstate commerce." *Lopez*, 514 U.S. at 561; *see also United States v. Morrison*, 529 U.S. 598, 611 (2000) ("*Lopez*'s review of Commerce Clause case law demonstrates that in those cases where we have sustained federal regulation of intrastate activity based upon the activity's substantial effects on interstate commerce, the activity in question has been some sort of economic endeavor."). I have no difficulty concluding that the furtherance of schemes devised for the purpose of defrauding others can be viewed as economic activity within the meaning of *Lopez* and *Morrison. See Gibbs v. Babbitt*, 214 F.3d 483, 491 (4th Cir. 2000) ("[E]conomic activity must be understood in broad terms."). Further, in the aggregate, the intrastate use of interstate carriers to further fraudulent schemes has a substantial harmful effect on interstate commerce.* Thus, I would hold that the mail fraud statute, as applied to PDS and Webb's intrastate activities, is constitutional because the fraudulent mailings have a substantial effect on interstate commerce.

III.

Because I believe that Congress did not intend the mail fraud statute to regulate and protect private and commercial interstate mail carriers as instrumentalities, I disagree with the majority's holding in Section III A. 2-4 that *Lopez*'s second category renders the mail fraud statute constitutional under the Commerce Clause. Nevertheless, because the regulated activity at issue has a substantial effect on interstate commerce and is, therefore, a permissible exercise of Congress's Commerce Clause power under *Lopez*'s third category, I concur in the judgment. I also concur in the remainder of the opinion.

---

*This is illustrated by the fraudulent activity in this case, wherein PDS and Webb used their commercial relationship with VDOT to defraud prime contractors on VDOT projects, some of which involved federal highways.